# <u>EXHIBIT A</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**June 14, 2019 11:57**

By: CHRISTOPHER C. ESKER 0040709

Confirmation Nbr. 1737782

| | |
|---|---|
| ANTHONY SCARBRO | CV 19 916786 |
| vs. | |
| CLIFFORD PINKNEY, SHERIFF OF CUYAHOGA COUNT, ET AL | **Judge:** JOAN SYNENBERG |

**Pages Filed:** 81

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| ANTHONY SCARBRO<br>4927 E. 107th Street<br>Garfield Heights, Ohio 44125, | ) | CASE NO. |

ANTHONY SCARBRO )
4927 E. 107th Street )
Garfield Heights, Ohio 44125, )

      Plaintiff, )

-vs- )

CLIFFORD PINKNEY, IN HIS CAPACITY AS )
SHERIFF OF CUYAHOGA COUNTY, OHIO )
1215 W. 3rd Street )
Cleveland, Ohio 44113 )

-and- )

CUYAHOGA COUNTY SHERIFF'S OFFICE )
1215 W. 3rd Street )
Cleveland, Ohio  44113 )

-and- )

JOHN DOES AND JANES DOES 1-3 )
EMPLOYEES, AGENTS, AND/OR )
REPRSENTATIVES OF THE CUYAHOGA )
COUNTY SHERIFF'S OFFICE )
Names Not Presently Known )
1215 W. 3rd Street )
Cleveland, Ohio  44113, )

-and- )

THE METROHEALTH SYSTEM )
2500 MetroHealth Drive )
Cleveland, Ohio 44109 )

-and- )

JOHN DOES AND JANES DOES 1-3 )
EMPLOYEES, AGENTS, AND/OR )
REPRSENTATIVES OF )
THE METROHEALTH SYSTEM )
NAMES NOT PRESENTLY KNOWN )
2500 MetroHealth Drive )
Cleveland, Ohio 44109, )

      Defendants. )

CASE NO.

JUDGE

**COMPLAINT (REFILED)**

**TYPE:  PERSONAL INJURY;
NEGLIGENCE; VIOLATIONS
OF CIVIL RIGHTS, PRIVILEGES
AND IMMUNITIES UNDER THE
CONSTITUTION SUBJECT TO
REDRESS UNDER 42 U.S.C. § 1983**

(PREVIOUSLY FILED UNDER
CASE NO. CV-18-891845 AND
ASSISGNED TO
JUDGE JOAN SYNENBERG)

*JURY DEMAND ENDORSED HEREON*

Now comes Plaintiff, Anthony Scarbro, by and through counsel, and for his refiled Complaint in this matter hereby states as follows:

### COUNT ONE: NEGLIGENCE – CUYAHOGA COUNTY DEFENDANTS

1.     That on or about October 23, 2015, Plaintiff Anthony Scarbro was detained and arrested, then incarcerated in the Cuyahoga County Jail, and held therein under the exclusive direction and control of Clifford Pinkney, Sheriff of Cuyahoga County, the Cuyahoga County Sheriff's Office, and John Does and Jane Does 1-3, employees, agents, and/or representatives of the Cuyahoga County Sheriff's Office (the "County Defendants"), and each of them, where he was held from that time pending trial under Case Nos. CR-15-600542-A and CR-16-602409-A, the former of which was dismissed on April 26, 2016, and the latter of which proceeded to a jury trial, with a jury of his peers acquitting Anthony Scarbro on all counts on April 26, 2016, and that he was released from the Cuyahoga County Jail on April 27, 2016.

2.     That during his term of incarceration by the County Defendants, and each of them, Plaintiff Anthony Scarbro suffered certain physical injuries as a direct and proximate result of the County Defendants' negligence, and each of theirs,  during the term of his incarceration and within their exclusive custody and control, including but not limited to the substandard, reckless, and/or negligent care and treatment provided by the County Defendants, and each of them, in the Cuyahoga County Jail, as operated by the Cuyahoga County Sheriff's Office, and as funded by Cuyahoga County, Ohio, and including but not limited to negligently maintaining and negligently exposing Plaintiff to such conditions within the Cuyahoga County Jail as to cause him to contract and suffer a serious and debilitating staph infection (Staphylococcus Aureus) in his nose and facial area, the discovery of which such infection was not reasonably made known to him until after the first of several surgeries he was required to undergo on and after January 21, 2016.

2

3.      That from and after January 21, 2016, while incarcerated by the County Defendants, and each of them, and within their exclusive custody and control, Plaintiff was required to undergo certain medical treatments, including surgical intervention, in an effort to control the staph infection, resulting in excruciating pain, periods of incapacitation, permanent disfigurement, and permanent nerve damage and scarring.

4.      That from and after January 21, 2016, while still incarcerated by the County Defendants, and each of them, and within their exclusive custody and control, Plaintiff was carelessly, recklessly, and/or negligently denied the use of certain medications as prescribed by his surgeon and medical care providers that, to his understanding, would have lessened his physical suffering, aided in his physical recovery, been beneficial to his overall health and recovery, and otherwise would have fostered his further healing, resulting in further pain and permanent scarring and disfigurement.

5.      That Plaintiff, on and after January 21, 2016, while still incarcerated by the County Defendants, and each of them, and within their exclusive custody and control, specifically grieved and brought to the County Defendants' attention, and each of them, the issues and concerns related to his physical injuries and insults as suffered through the carelessness, recklessness and/or negligence of the County Defendants, and each of them, during the term of his incarceration, and that the County Defendants, and each of them, through carelessness, negligence, recklessness, or negligent indifference or disregard, caused Plaintiff to suffer permanent and debilitating injuries, including but not limited to limited nasal function, permanent facial disfigurement, permanent nerve damage, and continuing pain and suffering.

6.      That the County Defendants, and each of them, owed a duty and obligation to Plaintiff to operate the Cuyahoga County Jail and the Cuyahoga County Sheriff's Office in such a

3

manner as to be free from carelessness, negligence and/or recklessness, and/or neglect of duty, during the term of Plaintiff's incarceration, and with a duty to exercise all due care for Plaintiff; that the County Defendants, and each of them, failed in their duties and obligations thereunder; and that the County Defendants, and each of them, having carelessly, negligently, and/or recklessly, through neglect of duty and/or with negligent indifference or disregard, failed to adequately maintain the Cuyahoga County Jail during the period of Plaintiff's incarceration, while Plaintiff was within their exclusive custody and control, directly and proximately causing Plaintiff to suffer permanent and debilitating injuries, including but not limited to limited nasal function, permanent facial disfigurement, permanent nerve damage, and continuing pain and suffering.

7.    That as a direct and proximate result of the County Defendants' carelessness, negligence, recklessness, and/or lack of due care, Plaintiff was made to certain immediate, significant and debilitating physical and other injuries requiring medical care and services, continuing medical care and services, and future medical care and services, and permanent physical nerve damage and facial scarring and loss of sensory function.

8.    That as a direct and proximate result of the carelessness, negligence, recklessness, and/or lack of due care of the County Defendants, and each of them, Plaintiff sustained excruciatingly painful and permanent personal physical injuries resulting in certain significant financial losses, pain, and accommodation, and that he incurred and will continue to incur certain medical and other expenses thereby into the future.

9.    That as a direct and proximate result of the carelessness, negligence, recklessness, and/or lack of due care of the County Defendants, and each of them, Plaintiff will continue to incur medical and other expenses into the indefinite future and that Plaintiff will suffer significant financial losses, pain, and accommodation into the indefinite future, and that certain of Plaintiff's

4

physical injuries are permanent in nature.

## COUNT TWO: CIVIL RIGHTS VIOLATIONS – CUYAHOGA COUNTY DEFENDANTS

10.     Plaintiff realleges and reincorporates all allegations and statements of fact as made in the preceding paragraphs of his Complaint herein.

11.     Under 42 U.S.C. § 1983**, e**very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

12.     That during his term of incarceration, Plaintiff Anthony Scarbro suffered certain physical injuries as a direct and proximate result of the County Defendants' carelessness, recklessness, and/or negligence, and each of theirs,  during the term of his incarceration and within their exclusive custody and control, including but not limited to the careless, reckless, and/or negligent care and treatment provided by the County Defendants, and each of them, in the Cuyahoga County Jail, as operated by the Cuyahoga County Sheriff's Office, and as funded by Cuyahoga County, Ohio, and including but not limited to carelessly, recklessly, and/or negligently maintaining and/or carelessly, recklessly, and/or negligently exposing Plaintiff to such conditions within the Cuyahoga County Jail as to cause him to contract and suffer a serious and debilitating staph infection (Staphylococcus Aureus) in his nose and facial area, the discovery of which such infection was not reasonably known to him until after the first of several surgeries he was required to undergo on and after January 21, 2016.

13.     That from and after January 21, 2016, while still incarcerated by the County

5

Defendants, and each of them, and within their exclusive custody and control, Plaintiff was required to undergo certain medical treatments, including surgical intervention, in an effort to control the staph infection, resulting in excruciating pain, periods of incapacitation, permanent disfigurement, and permanent nerve damage and scarring.

14.     That Plaintiff, on and after January 21, 2016, while still incarcerated by the County Defendants, and each of them, and within their exclusive custody and control, specifically grieved and brought to the County Defendants' attention, and each of them, the issues and concerns related to his physical injuries and insults as suffered through the carelessness, recklessness and/or negligence of the County Defendants, and each of them, during the term of his incarceration, and that the County Defendants, and each of them, through carelessness, negligence, recklessness, or negligent indifference or disregard, caused Plaintiff to suffer permanent and debilitating injuries, including but not limited to limited nasal function, permanent facial disfigurement, permanent nerve damage, and continuing pain and suffering.

15.     That the County Defendants, and each of them, owed a duty and obligation to Plaintiff to operate the Cuyahoga County Jail and the Cuyahoga County Sheriff's Office in such a manner as to be free from carelessness, negligence and/or recklessness, and/or neglect of duty, during the term of Plaintiff's incarceration, and with a duty to exercise all due care for Plaintiff; that the County Defendants, and each of them, failed in their duties and obligations thereunder; and that the County Defendants, and each of them, having carelessly, negligently, and/or recklessly, through neglect of duty and/or with negligent indifference or disregard, failed to adequately maintain the Cuyahoga County Jail during the period of Plaintiff's incarceration, while Plaintiff was within their exclusive custody and control, directly and proximately causing Plaintiff to suffer permanent and debilitating injuries, including but not limited to limited nasal function, permanent facial

6

disfigurement, permanent nerve damage, and continuing pain and suffering.

16.     That as a direct and proximate result of the County Defendants' carelessness, negligence, recklessness, and/or lack of due care, Plaintiff was made to certain immediate, significant and debilitating physical and other injuries requiring medical care and services, continuing medical care and services, and future medical care and services, and permanent physical nerve damage and facial scarring and loss of sensory function.

17.     That as a direct and proximate result of the carelessness, negligence, recklessness, and/or lack of due care of the County Defendants, and each of them, Plaintiff sustained excruciatingly painful and permanent personal physical injuries resulting in certain significant financial losses, pain, and accommodation, and that he incurred and will continue to incur certain medical and other expenses thereby into the future.

18.     That on or after November 1, 2018, the United States Marshal's Service, Prisoner Operations Division published its Quality Assurance report regarding its Facility Review of the Cuyahoga County Correctional Center (the "Facility Review"), a copy of which is attached hereto and incorporated herein and hereby as Exhibit A to Plaintiff's Complaint.

19.     That the Facility Review was widely published, disseminated, and reviewed by medial outlets, bringing to light those operational and personnel deficiencies within the Cuyahoga County Correctional Center, under the direct control of the County Defendants, that found, among the multiple deficiencies and issues, that "Non-compliances with the [Federal Performance-Based Detention Standards] were identified in all functional areas [of the Cuyahoga County Correctional Center]. Administration and Management, Food Service, Restrictive Housing and Safety and Sanitation were determined to be 'Unsatisfactory/At-Risk', Security and Control and Health Care are 'Marginal'…", that the "performance of this function is so defective or deficient, it actually

7

presents a risk to the safety of staff and detainees [and that] the risk include life and safety concerns as well as inhumane conditions or confinement, which violate safe, secure, humane conditions and/or violate detainee/inmate Constitutional rights," and that "not one of the identified 119 deficiencies or non-compliance findings since [the previous] 2015 [voluntary pre-PREA Audit] has been corrected."

20.     That the Cuyahoga County Sheriff maintains and sets forth its Mission Statement, stipulating, admitting, and conceding that, among other items, that as "agents of the community, we strive to provide appropriate custodial care along with programs that support the physical, spiritual and constitutional needs of individuals committed to our custody. Further, every effort will be made to assist the inmates in our custody to understand and take responsibility for their involvement in the justice system." See the Cuyahoga County, Agency of Inspector General, Report of Investigation 18-0050-I, page 2 of 14, dated December 31, 2018, amended January 8, 2019, attached hereto and incorporated herein and hereby as Exhibit B to Plaintiff's Complaint.

21.     That through the actions of the County Defendants, and each of them, and under the color of any and all relevant and applicable statutes, ordinances, regulations, customs, or usages of the County of Cuyahoga, including those demonstrated by Exhibit B to this Complaint, the State of Ohio, and/or the United States of America, included those demonstrated by Exhibit A to this Complaint, the County Defendants, and each of them, subjected, or caused to be subjected, Plaintiff to the deprivation of his rights, privileges, and/or immunities as secured by the United States Constitution and such other laws as set forth above, herein, and hereunder, and that the County Defendants, and each of them, are liable to Plaintiff under the provisions of 42 U.S.C. § 1983 for his injuries so suffered and endured, in and for his redress as against the County Defendants, and each of them.

8

22.     That as a direct and proximate result of the actions of the County Defendants', and each of theirs, through the deprivation of Plaintiff's rights, privileges, and/or immunities as secured by the United States Constitution and such other laws, Plaintiff will continue to incur medical and other expenses into the indefinite future and that Plaintiff will suffer significant financial losses, pain, and accommodation into the indefinite future, and that certain of Plaintiff's physical injuries are permanent in nature.

## COUNT THREE: NEGLIGENCE – METROHEALTH DEFENDANTS

23.     Plaintiff realleges and reincorporates all allegations and statements of fact as made in the preceding paragraphs of his Complaint herein.

24.     To Plaintiff's belief and understanding, during his term of incarceration by the County Defendants, certain services may have been provided to Plaintiff either directly by Defendant The MetroHealth System and/or and John Does and Jane Does 1-3, employees, agents, and/or representatives of the The MetroHealth System (the "MetroHealth Defendants"), or through an agreement, contract, or arrangement with and through the County Defendants.

25.     In the previous filing of this matter, the County Defendants, by and through their counsel in that matter, alleged and suggested through certain filings made with the Court that certain of Plaintiff's claims in the previously-filed matter may have involved claims of medical negligence and/or malpractice.

26.     While Plaintiff's personal knowledge and facts reasonably known to andy by him at the time of the filing of his previous complaint in this matter did not include his specific belief or knowledge that he had been specifically subjected to medical malpractice during the term of his incarceration, the County Defendants' suggestion that some component of medical malpractice may have been involved in his care, conservation, and treatment during his confinement and detention by

9

the County Defendants representing the first of any such notification, certain information subsequently made public, including but not limited to the information contained in Exhibits A and B, as well as widely-distributed media reports, particularly on and after November 1, 2018, as well as the County Defendants' own suggestions in the case as previously filed, caused Plaintiff to prepare and serve upon the MetroHealth Defendants such notice as may be required under Ohio Revised Code §2305.11(B) on or about January 19, 2019, a true and accurate copy of which is attached hereto and incorporated herein as Exhibit C to Plaintiff's Complaint.

27.     Plaintiff may have received professional medical services from the County Defendants, the MetroHealth Defendants, and/or each and any of them, from and after October 23, 2015, and thus operating health care facilities located in Cuyahoga County, Ohio, and holding themselves out to the public, including Plaintiff, as having the requisite skilled personnel, staff, and equipment to render quality health care services to the public, including Plaintiff.

28.     That in providing such professional medical services, the County Defendants and/or the MetroHealth Defendants, and/or each and any of them, from and after October 23, 2015, jointly and severally, were negligent in their care and treatment of Plaintiff.

29.     That as a direct and proximate result of the negligence of the County Defendants and/or the MetroHealth Defendants, and/or each and any of them, Plaintiff suffered injuries and damages which are permanent in nature, and he has incurred substantial medical expenses, and is continuing to incur substantial medical expenses, has incurred pain and suffering, and has suffered the loss of the enjoyment of the usual activities of life, both past and in the future.

30.     Plaintiff does not have knowledge of the true names, addresses and capacities of the Defendants named herein as John Does and Jane Does 1-3, employees, agents, and/or representatives of the The MetroHealth System, and/or John Does and Jane Does 1-3, employees,

10

agents, and/or representatives of the Cuyahoga County Sheriff's Office, and therefore names these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when the same are ascertained. Upon information and belief, each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct, both jointly and severally, of all Defendants named herein.

WHEREFORE, Plaintiff Anthony Scarbro demands judgment as follows:

A.        **Upon Count One**, and against Defendants Clifford Pinkney, in his capacity as Sheriff of Cuyahoga County, the Cuyahoga County Sheriff's Office, and John Does and Jane Does 1-3, Employees, Agents and/or Representatives of the Cuyahoga County Sheriff's Office, joint and several judgment in favor of Plaintiff Anthony Scarbro including compensatory damages in an amount in excess of $25,000, plus pre-judgment and post-judgment interest, all costs, expenses and attorney fees of any kind, and all other relief this Court may deem appropriate;

B.        **Upon Count Two**, and against Defendants Clifford Pinkney, in his capacity as Sheriff of Cuyahoga County, the Cuyahoga County Sheriff's Office, and John Does and Jane Does 1-3, Employees, Agents and/or Representatives of the Cuyahoga County Sheriff's Office, joint and several judgment in favor of Plaintiff Anthony Scarbro including punitive and compensatory damages in an amount in excess of $25,000, plus pre-judgment and post-judgment interest, all costs, expenses and attorney fees of any kind, and all other relief this Court may deem appropriate;

11

C.  **Upon Count Three**, and against Defendants Clifford Pinkney, in his capacity as Sheriff of Cuyahoga County, the Cuyahoga County Sheriff's Office, and John Does and Jane Does 1-3, Employees, Agents and/or Representatives of the Cuyahoga County Sheriff's Office, and/or Defendant The MetroHealth System and/or and John Does and Jane Does 1-3, employees, agents, and/or representatives of the The MetroHealth System, joint and several judgment in favor of Plaintiff Anthony Scarbro including compensatory damages in an amount in excess of $25,000, plus pre-judgment and post-judgment interest, all costs, expenses and attorney fees of any kind, and all other relief this Court may deem appropriate

D.  For all costs and expenses as may be in any way related to this matter, any and all appropriate and available relief this Court deems proper.

Respectfully submitted,

**RODERICK LINTON BELFANCE, LLP**

*/s/ Christopher C. Esker*

Christopher C. Esker, Esq. (0040709)
50 South Main Street, 10th Floor
Akron, Ohio  44308
Telephone No. (330) 434-3000
Facsimile No.  (330) 434-9220
E-mail address:  cesker@rlbllp.com
Attorney for Plaintiff Anthony Scarbro

## JURY DEMAND

Plaintiff demands a trial by jury upon all issues in the above-captioned matter.

*/s/ Christopher C. Esker*

Christopher C. Esker, Esq. (0040709)

12



# QUALITY ASSURANCE

Cuyahoga County Correctional Center
Facility Review
October 30 - November 1, 2018



EXHIBIT
A

CUYAHOGA
COUNTY
CORRECTIONAL
CENTER

Oct 30-Nov 1, 2018

Quality Assurance Report

## Table of Contents

Executive Summary…………………………………………………………………………………....................2

Facility Review Team…………………………………………………………………………………………3

USMS Personnel…………………………………………………………………………………………3

Facility Information…………………………………………………………………………………5

Staffing By Functional Areas…………………………………………………………………6

Functional Area Ratings…………………………………………………………………………6

Overall Performance Ratings…………………………………………………………………7

Deficient Areas…………………………………………………………………………………………8

Capacity…………………………………………………………………………………………………24

**General Overview by Functional Area** ........................................................ **25**

A - Administration and Management ................................................................25

B - Health Care ..............................................................................................28

C - Security and Control ................................................................................33

D - Food Service ............................................................................................36

G - Services and Programs .............................................................................45

**Detailed Findings by Functional Area**........................................................... **48**

A - Administration and Management ................................................................48

B - Health Care ..............................................................................................49

C - Security and Control ................................................................................49

D - Food Service ............................................................................................50

E - Restrictive Housing ..................................................................................50

F - Safety and Sanitation ...............................................................................51

G - Services and Programs .............................................................................51

**Executive Summary**

The purpose of this Facility Review is to provide the United States Marshals Service (USMS), Prisoner Operations Division (POD) a comprehensive overview of operations at the Cuyahoga County Correctional Center (CCCC) located in Cleveland, Ohio. The Facility Review uses the Federal Performance-Based Detention Standards (FPBDS) for non-federal detention facilities. The FPBDS are designed to ensure the safe, secure, and humane confinement of federal detainees and provide a document to indicate the facility's level of performance. The overall facility operation received a rating of **"Unsatisfactory/At-Risk"**.

The Facility Review was conducted by a team of contract correctional subject matter experts (SMEs) from the Correctional Management and Communications Group, LLC. CCCC co-houses USMS detainees in the same housing units (USMS detainees are not separated out, identified or defined by any distinguished or unique identifying factor, or housed in USMS only pods or housing units) with other county inmates, therefore the focus of this review is on the conditions of confinement for the entire population and references both USMS detainees and CCCC inmates. During the three-day onsite visit, the team toured and observed operations of all CCCC facilities including the Cuyahoga County Jail I Annex in Bedford and the Cuyahoga County Jail II Annex, in Euclid.  The Facility Review included review of all relevant policies, procedures, and other supporting documentation. Facility Review team staff conducted numerous interviews with facility staff, contractors, USMS detainees and Cuyahoga County inmates.

Facility staff and contractors were professional and responsive to the Facility Review team members' requests for information, documentation and access throughout all facilities. Some staff members approached Facility Review team SME's willingly shared information beyond the interview questions while others were guarded in their responses.

Facility Review team members interviewed a sampling (200+) of the detainee/inmate populations to determine their perception of personal treatment, health care, food service, sanitation and overall facility operations. 80% of the detainees/inmates interviewed expressed concern with health care, food service, sanitation, and 100% of the detainees/inmates feared retaliation by or from the Security Response Team (SRT) staff or other Correctional Officer staff members for speaking with Facility Review team members.  More than 20 anonymous notes or letters were passed to Facility Review team members directly by detainees/inmates confined to the Restrictive Housing Unit, expressing fear of brutal retaliation and in some cases fear for their life.

Non-compliances with the FPBDS were identified in all functional areas. Overall, Administration and Management, Food Service, Restrictive Housing and Safety and Sanitation were determined to be **"Unsatisfactory/At-Risk"**, Security and Control and Health Care are "Marginal", and Services and Programs is "Satisfactory".

The **"Unsatisfactory/At-Risk"** designation indicates performance of the functional area does not meet most contractual requirements and recovery is not likely in a timely manner. Additionally the performance of the function is so defective or deficient, it actually presents a risk to the safety of staff and detainees; the risk include life and safety concerns as well as inhumane conditions of confinement, which violate safe, secure, humane conditions and/or violate detainee/inmate Constitutional Rights.



Attributing to the overall **"Unsatisfactory/At-Risk"** rating is significant **"At-Risk"** findings and behaviors associated is:

➢ An inadequate medical program, unexplained causes of two detainee deaths which occurred while the inmates were in CCCC custody, failure to perform post mortem mortality reviews, and insufficient and unclear answers regarding six recent inmate deaths (which includes the two previous unexplained deaths). There is no documentation available for review in absence of Mortality Reviews to identify life safety issues or to verify or discredit CCCC contributory factors;

➢ The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration;

➢ Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone". The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

➢ Refusal to install shower curtains for detainees/inmates housed in the "Red Zone" RHU, detainees/inmates are afforded not privacy when they are eventually allowed to take a shower; during showering detainees are in full view of any staff, or detainees in the shower area, as well as visible through narrow oblong windows which look directly into the showering area from the common access hallway;

➢ The co-locating of juvenile detainees with adult offenders in the RHU; detainees are not sight and sound separated, are not receiving the enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

➢ Detainee/inmates assigned to "No Contact Housing" (Special confinement restrictions ordered by the court which include no access to mail, telephones, or general population) are denied general housing privileges to which they are entitled, as they are not confined for disciplinary reasons. Detainee/inmates assigned to "No Contact Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are subjected to the same "Red Zone" lockdown system as RHU detainee/inmates. Additionally, interviews with detainees/inmates in



the "No Contact Housing" who are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

➢ CCCC is not Prison Rape Elimination Act (PREA) compliant despite undergoing a voluntary pre-PREA AUDIT 2015. The voluntary pre-PREA Audit identified 119 deficiencies or non-compliance findings; further inquiry and review of documentation reveal not one of the identified 119 deficiencies or non-compliance findings since 2015 has been corrected;

➢ CCCC fire emergency drills are not being performed and facility staff could not demonstrate they can safely evacuate detainees/inmates from the facility;

➢ The CCCC is currently operating over the American Correctional Associations rated capacity, as such detainees/inmates must regularly sleep on mattresses on the floor; during the review two pregnant females were found to be sleeping on mattresses on the floor;

➢ Detainee/inmate court meals were not properly refrigerated or stored and were found placed in an unused office area which reeked of dead vermin; and

➢ Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or have access to running water, are stripped of all furnishing to include a place to sit, and were found to house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons. Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10 hours.

A closeout briefing was conducted on Thursday, November 1, 2018. Those present included: Theo Anderson, Chief, Detention Standards and Compliance, POD, USMS; Rickye Rice, Assistant Chief, Detention Standards and Compliance, POD, USMS; Heather Bonsell, Chief, MMB, USMS; Laura Gardner, Detention Contract Administrator, Northeast Ohio, USMS; Peter Elliott, US Marshal, Northern District of Ohio, Troy Mizel, Northern District of Ohio, USMS, Anne Murphy, Northern District of Ohio, USMS; Lisa Kaplan, CV, Special Agent, Civil Rights, FBI, Preetham Rao, Special Agent, Federal Bureau of Investigations (FBI); Sicily Woods, Deputy Inspector General, Agency of Inspector General, Cuyahoga County; and members of the Review Team.

**Facility Review Team**

| Facility Name | Name | Title |
|---|---|---|
| Cuyahoga County Correctional Center | Flora Brooks Boyd | Lead Reviewer, Administration and Management and Services and Programs SME |
| | Francisca Terrero-Leibel | Health Care SME |
| | Marcus Baldwin | Security and Control SME: |
| | Bernard Higgins | Restrictive Housing SME: |
| | Rene Garcia | Food Service SME |
| | Ezell Jackson | Safety and Sanitation SME |
| | Jeffery Foster | Lead Reviewer Trainee |



**USMS Personnel**

| Name | Title |
|------|-------|
| Theo Anderson | Chief, Detention Standards and Compliance, POD, USMS |
| Rickye Rice | Assistant Chief, Detention Standards and Compliance, POD, USMS |
| Heather Bonsell | Chief, Medical Management Branch, POD, USMS |
| Laura Gardner | Detention Contract Administrator, POD, (Northeast Ohio) USMS |

**Accompanying Review Personnel**

| Name | Title |
|------|-------|
| Anne Murphy | (A) Assistant Chief Deputy, Northern District of Ohio, USMS |
| Troy Mizel | Supervising Deputy, Northern District of Ohio, USMS |
| Lisa Kaplan | Federal Bureau of Investigations, Fraud and Economics Unit, Cleveland |
| Preetham Rao | Special Agent, Federal Bureau of Investigations, Cleveland |
| Sicily Woods | Deputy Inspector General, Office of the Inspector General, Cuyahoga County |

**Facility Information**

The CCCC is located in downtown Cleveland, Ohio, CCCC is owned by Cuyahoga County and operated by the Cuyahoga County Sheriff's Department. CCCC consists of two high rise buildings (Jail I and Jail II) and two satellite locations (Bedford Heights Comprehensive Re-entry Programming Center and Euclid Jail Annex). The facility houses all levels of security statuses, from maximum security to weekenders.

The current contract agreement (60-10-0049) between the USMS and CCCC allows for housing 15 male USMS detainees. The contract became effective September 30, 2010 and indicates a fixed rate of $81 per day for housing USMS detainees. Sheriff's Deputies provide court transportation for USMS detainees to the federal courthouse which is approximately a half a mile from the facility. The contract requires detainees to be housed in a manner consistent with federal law and the Federal Performance-Based Detention Standards

The facility's rated capacity is 1765 (1455 males and 310 females). On the first day of the Facility Review, there were a total of 2420 inmates (2360) and detainees (60). The average length of stay is 29 days.

Jail I consist of seven floors (3rd-10th) with a total of 45 pods. Jail II has seven floors (2nd, 3rd, 4th, 5th, 7th, 9th and 11th) with a total of 29 pods. Nine pods in Jail II are dedicated to house the Cleveland City inmates. Bedford Heights' total capacity is 83 males and Euclid Jail Annex total capacity is 179 (176 males and 3 females). CCCC's organizational structure includes: a Director of Regional Corrections who reports to the Cuyahoga County Sheriff and oversees administrative and program functional areas for the CCCC and its Annex Jail I and Jail II facilities: a Medical Director who also reports to the Sheriff and manages health care services for the CCCC and its Annex Jail I and Jail II facilities; and a Warden, who is responsible for managing and supervising the Sergeants who oversee the day-to-day operations of the CCCC and its Annex Jail I and Jail II facilities. The total authorized correctional officer custody staff compliment is 677 however, at the time of the Facility Review there are approximately 96 vacancies.

CCCC has no national accreditations. The Department of Justice Prison Rate Elimination Act (PREA) field auditors' training program conducted a PREA audit in 2015 and the Interim report dated January 2016



identified 119 deficient findings or areas of non-compliance which required corrective actions. The 119 findings require addressing and correcting prior to the CCCC being prepared for a formal PREA Compliance Audit; review of the CCCCs PREA corrective action plan reveal no corrective action has been taken. The facility is unable to provide information regarding the number of non-English-speaking detainees/inmates nor is the number of staff who speak languages other than English available. CCCC does not track the languages staff speak or attempt to determine how the Spanish population is accommodated. The detainee/inmate handbook is only available in English. The facility is not under any court orders or pending litigation.

**Staffing by Functional Areas**

| Functional Area | # of Authorized Staff | # of Staff on Board | # of Authorized Subcontract Staff | # of Subcontract Staff |
|---|---|---|---|---|
| A - Administration and Management | | | 0 | 0 |
| B - Health Care | 67 | 55 | 23 | 14 |
| C - Security and Control | 673 | 577 | 0 | 0 |
| D - Food Service | 12 | 11 | 0 | 0 |
| E - Restrictive Housing | 28 | 28 | 0 | 0 |
| F - Safety and Sanitation | 14 | 14 | 0 | 0 |
| G - Services and Programs | 9 | 6 | 0 | 0 |
| Total | 810 | 698 | 23 | 14 |

**Contingency/Emergency Sites: None**

**Functional Area Ratings**

**Exceptional** - The level of performance exceeds the requirements of the FPBDS with exceptional internal controls. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility; the policies and procedures are communicated to the staff; fully implemented; and the desired outcome is achieved. Findings and Deficiencies are non-existent.

**Very Good** - The level of performance exceeds the requirements of the FPBDS. Internal controls limit Findings and Deficiencies. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility, the policies and procedures are communicated to the staff, implemented and the desired outcome is achieved. Findings and or Deficiencies are minimal and do not affect the performance of the facility.

**Satisfactory** - The program is meeting the requirements of the FPBDS. Lapses in internal controls are minimal. Findings and Deficiencies do not affect the performance of the facility.

**Marginal** - The program is unable to meet the requirements of any one of the 6 Functional Areas or one or more of the 47 Standards. Deficiencies are the result of weak internal controls in one or more areas. The facility is meeting the minimal requirements of the performance standards.

**Unsatisfactory** - Operation of the program is impaired to the point that the facility is unable to



accomplish its mission.  The program is unable to meet the requirements of the FPBDS and is  unlikely to meet those requirements without immediate corrective action to ensure the safety and   security of both staff and detainees.

**Overall Performance Ratings**

| Rating | Contract Requirements | Problems | Corrective Actions |
|---|---|---|---|
| **Exceptional** | Exceeds Many - Gov't Benefit | Few Minor | Highly Effective |
| **Very Good** | Exceeds Some - Gov't Benefits | Some Minor | Effective |
| **Satisfactory** | Meets All | Some Minor | Satisfactory |
| **Marginal** | Does Not Meet Some - Gov't Impact | Serious: Recovery Still Possible | Marginally Effective; Not Fully Implemented |
| **Unsatisfactory** | Does Not Meet Most - Gov't Impact | Serious: Recovery Not Likely | Ineffective |

**Exceptional -** Performance meets contractual requirements and exceeds many to the   Government's benefit. The contractual performance of the element or sub-element being  evaluated was accomplished with few minor problems for which corrective actions taken by the  contractor were highly effective.  To justify an Exceptional rating, identify multiple significant  events and state how they were of benefit to the Government. A singular benefit, however, could  be of such magnitude that it alone constitutes an Exceptional rating. Also, there should have been   NO significant weaknesses identified.

**Very Good -** Performance meets contractual requirements and exceeds some to the  Government's benefit. The contractual performance of the element or sub-element being  evaluated was accomplished with some minor problems for which corrective actions taken by the  contractor was effective. To justify a Very Good rating, identify a significant event and state how  it was a benefit to the Government. There should have been no significant weaknesses identified.

**Satisfactory -** Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory.  To justify a Satisfactory rating, there should have been  only minor problems, or major problems the contractor recovered from without impact to the   contract/order. There should have been NO significant weaknesses identified. A fundamental   principle of assigning ratings is that contractors will not be evaluated with a rating lower than  Satisfactory solely for not performing beyond the requirements of the contract/order.

**Marginal -** Performance does not meet some contractual requirements. The contractual   performance of the element or sub-element being evaluated reflects a serious problem for which   the contractor has not yet identified corrective actions. The contractor's proposed actions appear   only marginally effective or were not fully implemented. To justify Marginal performance,   identify a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government. A Marginal rating should be supported by referencing the  management tool that notified the contractor of the contractual deficiency (e.g., management,   quality, safety, or environmental deficiency report or letter).

**Unsatisfactory -** Performance does not meet most contractual requirements and recovery is not   likely in a timely manner. The contractual performance of the element or sub-element contains a   serious



problem(s) for which the contractor's corrective actions appear or were ineffective.  To  justify an unsatisfactory rating, identify multiple significant events in each category that the  contractor had trouble overcoming and state how it impacted the Government. A singular  problem, however, could be of such serious magnitude that it alone constitutes an unsatisfactory  rating. An Unsatisfactory rating should be supported by referencing the management tools used  to notify the contractor of the contractual deficiencies (e.g., management, quality, safety, or  environmental deficiency reports, or letters).
Compliance with FBPD Standards - By Functional Area

| Functional Area | Exceptional | Very Good | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| A - Administration and Management | | | 3 | 5 | 4 |
| B - Health Care | | | 2 | 4 | |
| C - Security and Control | | | 4 | 2 | 4 |
| D - Food Service | | | 1 | 1 | 3 |
| E - Restrictive Housing | | | 1 | | 7 |
| F - Safety and Sanitation | | | 3 | | 2 |
| G - Services and Programs | | | 7 | | 2 |
| J - PREA | | | | | |
| Total | 0 | 0 | 21 | 12 | 22 |

**Deficient Areas.**

**Administration and Management**

**(A.1.1)** The facility director ensures that written policies and procedures describe all facets of facility operation, maintenance, and administration.**4- ALDF-7D-06**

**(A.1.3)** Detainees can obtain copies of facility policies and procedures unless security concerns justly limit access. **4-ALDF-7D-06**

**(A.1.4)** Policies and procedures are reviewed and updated on an annual basis.
**4-ALDF-7D-06**

**(A.2.1)** An internal quality control plan requires an annual review of the facility operations to ensure compliance with facility policies and procedures. Corrective measures are identified and completed. **4-ALDF-7D-09**

**(A.2.2)** At a minimum, the internal quality control plan addresses the following areas:
**(A.2.2.a)** Detainee Health Care
**(A.2.2.b)** Security and Control
**(A.2.2.c)** Safety and Sanitation
**(A.2.2.d)** Food Service
**(A.2.2.e)** Detainee Grievance Program
**(A.2.2.f)** Staff Training/Professional Certifications



**(A.2.3)** The review of the detainee grievance program not only ensures the viability of the grievance program but identifies grievance trends pertaining to facility functions and staff.

**(A.2.4)** Documentation of the previous quality control review and the corrective action measures are kept on file.

**(A.2.5)** The facility administrator or assistant facility administrator, and designated department heads visit the facility's living and activity areas at least weekly to encourage information contact with staff and detainees and to encourage informal contact with staff and detainees and to informally observe living and working conditions. **4-ALDF-2A-06**

**(A.3.1)** The facility maintains custody records on all detainees committed or assigned to the facility

**(A.3.2)** Each detainee custody record will include the following:
**(A.3.2.a)** Intake/booking information
**(A.3.2.b)** Cash and property receipts
**(A.3.2.c)** Reports of disciplinary actions, grievances, incidents, or crimes(s) committed while in custody
**(A.3.2.d)** Frequency and cumulative length of restrictive housing placements **DOJ-Restrictive Housing Report**
**(A.3.2.e)** Records of program participation
**(A.3.2.f)** Work assignments
**(A.3.2.g)** Classification records

**(A.3.3)** The contents of detainee records are identified and separated according to a format approved by the facility director. **4-ALDF 7D-20**

**(A.4.1)** The admission process for newly admitted detainees includes but is not limited to**: 4-ALDF 2A-21**
**(A.4.1.c)** Medical, dental, and mental health screenings

**(A.4.5)** Prior to being placed in the general population, each detainee is provided with an orientation to the facility, which includes at a minimum
**(4-ALDF-2A-27; 4-ALDF-4D-22)**:
**(A.4.5.c)** Explanation of transportation options for visitors
**(A.4.5.d)** Explanation of grievance procedures
**(A.4.5.i)** The handbook is translated into those languages spoken by significant numbers of detainees

**(A.4.7)** Detainees verify, by signature, the receipt of their initial orientation and of the detainee handbook and written orientation materials. Signed acknowledgement of the handbook is maintained in the detainee's file.
**4-ALDF-2A-28**



**(A.4.8)** If a detainee cannot read orientation materials then they are read to the detainee by a staff member or are provided through the use of an audio or video tape. For detainees who do not speak English, interpretive services are provided. **4-ALDF-2A-28**

**(A.5.2)** Space is provided for storing the personal property of detainee's safety and securely. **4-ALDF 2A-24**

**(A.6.3)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(A.7.3)** Program and service areas are accessible to detainees with disabilities housed at the facility. **4-ALDF-6B-04**

**(A.8.1)** There is no discrimination regarding administrative decisions or program access based on a detainee's race, religion, national origin, gender, sexual orientation, or disability. **4-ALDF-6B-02**

**(A.9.1)** A comprehensive staffing analysis is conducted annually. Essential posts and positions, as identified in the staffing plan, are consistently filled with qualified personnel. **4-ALDF 2A-14**

**(A.9.3)** Background investigations include:
**(A.9.3.c)** Credit history

**(A.9.4)** A pre-employment physical examination is conducted for all potential Security personnel. **4-ALDF-7B-04**

**(A.9.6)** The facility conducts re-investigations of employees, contractors, and volunteers.

**(A.9.7)** Compliance with restrictive housing policies is reflected in the employee- evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(A.10.3)** All new professional and support employees, including contractors, who have regular or daily detainee contact receive training during their first year of employment. Forty hours are completed prior to being independently assigned to a particular job. An additional 40 hours of training is provided each subsequent year of employment. At a minimum, this training covers the following areas:
**(A.10.3.a)** Security procedures and regulations
**(A.10.3.b)** Supervision of detainees
**(A.10.3.c)** Signs of suicide risk
**(A.10.3.d)** Suicide precautions
**(A.10.3.e)** Use-of-force regulations and tactics
**(A.10.3.f)** Report writing
**(A.10.3.g)** Detainee rules and regulations
**(A.10.3.h)** Key control



**(A.10.3.i)** Rights and responsibilities of detainees
**(A.10.3.j)** Safety procedures
**(A.10.3.l)** Social/cultural lifestyles of the detainee population
**(A.10.3.m)** Cultural diversity
**(A.10.3.n)** Communication skills
**(A.10.3.p)** Counseling techniques

**(A.10.5)** All new correctional officers receive 160 hours of training during their first year of employment. At least 40 of these hours are completed prior to being independently assigned to any post. At a minimum, this training covers the following areas **(4-ALDF-7B-10)**:
**(A.10.5.o)** Correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics. **DOJ- Restrictive Housing Report**

**(A.10.6)** Written policy, procedure, and practice provide that all correctional officers receive at least 40 hours of annual training. This training shall include at a minimum the following areas **(4-ALDF-7B-10-1)**:
**(A.10.6.a)** Standards of conduct/ethics
**(A.10.6.b)** Security/safety/fire/medical/emergency procedures
**(A.10.6.c)** Supervision of offenders including training on sexual abuse and assault
**(A.10.6.d)** Use of force

**(A.10.7)** Facility management and supervisory staff receive at least 40 hours of management and supervision training during their first year and at least 24 hours of management training each year thereafter. **4-ALDF-7B-11**

**(A.11.1)** There is a plan that specifies the procedures to be followed in situations that threaten facility security. Such situations include but are not limited to:
**(A.11.1.c)** Disturbances

**(A.11.2)** The facility has written agreements securing the provision of emergency assistance as identified by the emergency plans.

**(A.11.3)** A plan provides for continuing operations in the event of a staff work stoppage or other job action. Copies of this plan are available to appropriate supervisory personnel. **4-ALDF-1C-06**

**(A.12.1)** The facility director ensures the immediate notification to the agency of jurisdiction of serious incidents including, but not limited to:
**(A.12.1.a)** Deaths;
**(A.12.1.b)** Suicide attempts;
**(A.12.1.c)** Hunger Strikes;
**(A.12.1.d)** Emergency medical trips;
**(A.12.1.e)** Escapes;
**(A.12.1.f)** Use of Force;



**(A.12.1.g)** Full or partial facility lockdowns;

**(A.12.1.h)** Incidents impacting facility operations (Riots, Disturbances, Food Strikes, Fires, Natural Disasters);

**(A.12.1.i)** Assaults on staff or detainees requiring medical attention;

**(A.12.1.j)** Detainee transportation incidents;

**(A.12.1.k)** Incidents attracting unusual interest or publicity.

**Health Care**

**(B.1.2)** The responsibilities of the health authority include: **4-D-ALDF-4D-01**

**(B.1.2b)** Developing a facility's operational health policy and procedures.

**(B.1.2e)** Developing a quality management program

**(B.1.5)** Health care services are provided by qualified healthcare personnel whose duties and responsibilities are governed by job descriptions that include qualifications and specific duties and responsibilities. **4-ALDF-4D-03**

**(B.1.7)** All professional staff comply with applicable state and federal licensure, certifications, or registration requirements. Verification of current credentials are on file in the facility. **4D-ALDF-4D-05**

**(B.1.13)** An automatic defibrillator is available for use at the facility. **4-ALDF-4D-09**

**(B.1.14)** Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible heath authority in cooperation with the facility or program administrator and includes instruction on the following: **4-ALDF-4D-08**

**(B.1.14a)** Recognition of signs and symptoms and knowledge of action that is required in potential emergency situations.

**(B.1.14b)** Administration of basic first aid.

**(B.1.14c)** Certification in CPR.

**(B.1.14d)** Method of obtaining assistance.

**(B.1.14e)** Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal.

**(B.1.14f)** Procedures for patient transfers to appropriate medical facilities or health care providers

**(B.1.15)** Individual health emergency (man-down) drill are conducted once a year on each shift where health staff are assigned. Each drill is evaluated. **NCCHC J-A-07**

**(B.2.5)** Medical screenings result in one of the following dispositions: Cleared for general population; Cleared for general population with prompt referral to appropriate health care service; or Referral to appropriate health care service for emergency treatment. **4-ALD-4C-22**



**(B.3.1)** A comprehensive health appraisal for each detainee is completed health care professional within 14-days after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90-days, a new health appraisal is not required except as determined by the designation health authority. **4-ALDF-4C-24**

**(B.3.2)** Health appraisals include the following: **4-ALDF-4C-24**
**(B.3.2h)** Development and implementation of treatment plan including recommendations concerning housing, job assignment, and program participation, when appropriate.

**(B.3.6)** An oral screening by dentist or qualified health care professional trained by a dentist is performed within 14-days of admission. **4-ALDF-4C-20**

**(B.4.1)** All detainees are informed about how to access health services during the intake/admission process in a manner understood by the detainee to include translation into languages spoken by a significant number of detainees, or verbally communicated to the detainee if literacy is an issue. **NCCHC 4C-01**

**(B.4.7)** Detainees who require health care beyond the capacity of the facility as determined by the responsible physician are transferred under appropriate security to a facility where such care is available. (All non-emergency outside are of USMS detainees shall require pre-authorization of the USMS to ensure consistency with the USMS detainee Heath Care Standards.) **NCCHC 4C-05**

**(B.5.2)** Patients with chronic diseases are identified and enrolled in a chronic disease program to decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function. Chronic diseases include, but are not limited to: asthma, diabetes, high blood cholesterol, HIV, hypertension, seizure disorder, tuberculosis, and major mental illnesses. **NCCHC J-G-01**

**(B.5.4)** The health authority maintains a list of chronic care patients. **NCCHC J-G-01**

**(B.5.5)** A proactive program exists that provides care for special needs patients who require medical supervision or multidisciplinary care. Special needs patients include, but are not limited to developmentally disabled individuals, frail/elderly, physical impairments which impair mobility, and patients with serious mental health needs. **NCCHC J-G-02**

**(B.5.6)** The health authority maintains a list of special needs patients. **NCCHC J-G-02**

**(B.5.13)** Management of bio-hazardous waste and decontamination of medical and dental equipment complies with applicable local, state, and federal regulations. **4-ALDF-4C-18 (Mandatory)**



**(B.5.17)** Management of pharmaceuticals includes: **4-ALDF-4C-38; NCCHC J-D-01; NCCHC J-D-02**

**(B.5.17d)** Secure storage and perpetual inventory of all controlled substances, syringes, and needles.

**(B.5.17e)** Administration of medication is by persons properly trained and under the supervision of the health authority and facility administrator or designee.

**(B.5.17f)** Providing a 7-day supply of prescribed medication to detainees transferring/releasing from the facility.

**(B.5.21)** Dental care includes the following: **4-ALDF-4C-20; NCCHC J-E-06**

**(B.5.21e)** Detainees in USMS custody for more than 12 months receive an oral examination

**(B.6.1)** Detainee Suicides

**(B.6.1h)** Suicide review debriefings include administration, health services, and security representatives.

**(B.6.5)** Detainee Death

**(B.6.5a)** As part of an overall protocol that describes the actions to be taken in the event of a detainee's death, the facility will immediately notify the agency of jurisdiction. **4-ALDF-4D-23**

**(B.6.5b)** All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.  This process will ensure: **NCCHC J-A-10**

**(B.6.5b.1)** All deaths are reviewed within 30 days

**(B.6.5b.2)** A death review consists:

**(B.6.5b.2.1)** An administrative review

**(B.6.5b.2.2)** A clinical mortality review

**(B.6.5b.2.3)** A psychological autopsy if death is by suicide

**(B.6.5b.3)** Treating staff are informed of the clinical mortality review and administrative review findings.

**(B.6.6)** Restrictive Housing

**(B.6.6b)** If a detainee with serious mental illness is paced in restrictive housing: DOJ-Restrictive Housing Report

**(B.6.6b.2)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing;

**(B.6.6b.3)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts a face-to-face clinical contact with the detainee, to monitor the detainee's mental health status and identify sign of deterioration.

## Security and Control

**(C.1.1)** Space is provided for a 24-hour secure control center for monitoring and coordinating the facility's security, life safety, and communications systems. 4-ALDF-2A-01



**(C.1.9)** Correctional supervisors review permanent logs on each shift to provide responsible department heads/shift supervisors with relevant information. These reviews are documented. 4-ALDF-2A-11

**(C.1.10)** Supervisory staff conduct a daily patrol, including holidays and weekends, of all areas occupied by detainees. Unoccupied areas are to be inspected at least weekly. Patrols and inspections are documented. 4-ALDF-2A-12

**(C.1.11)** A qualified person conducts at least weekly inspections of all security devices, identifying those needing repair or maintenance. Results of the weekly security inspections are reported in writing. 4-ALDF-2A-13

**(C.4.8)** The agency of jurisdiction is immediately notified of any Use of Force Incident or Non-Routine Application of Restraints.

**(C.4.9)** All Use of Force incidents are reviewed by the facility director to ensure compliance with the facility's Use of Force policy.

**(C.6.1)** The use of keys is controlled and inventoried. 4-ALDF-2D-01

**(C.6.2d)** Emergency key usage is documented.

**(C.6.4)** In the event detainee workers are assigned to work details involving the use of tools, facility policy identifies what tools may be used by detainees and identifies the level of required staff supervision.

**(C.6.5)** Medical and dental instruments, equipment, and supplies (syringes, needles, and other sharps) are controlled and inventoried. 4-ALDF-2D-03

**(C.7.1)** There are current written orders for every correctional officer post, which clearly outline duties, responsibilities, and expectations of that post. 4-ALDF-2A-04

**(C.7.3)** Officers assigned to those posts acknowledge in writing that they have read and understand the orders and record the date. 4-ALDF-2A-04

**(C.7.4)** The facility administrator or designee reviews post orders annually and updates them as needed. 4-ALDF-2A-04

**(C.8.2)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape or posting a threat to institutional safety by encouraging others to engage in such conduct. DOJ-Restrictive Housing Report

**(C.8.17)** Disciplinary decisions are based solely on information obtained in the hearing process, including staff reports, the statements of the inmate charged, and the evidence derived from witnesses and documents. 4-ALDF-6C-14

**(C.8.20)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. DOJ-Restrictive Housing Report

**Food Service**

**(D.1.2)** The Food Service Administrator or designee conducts daily inspections of all food service areas, including dining and food preparation areas and equipment. **4-ALDF-4A-15**

**(D.2.1)** Volunteer, detainee food service workers receive a pre-assignment medical examination and periodic reexamination to ensure freedom from diarrhea, skin infections, and other illnesses transmissible by food or utensils. **4-ALDF-4A-13**

**(D.2.5)** Food service employees/workers are required to wear clean outer clothing to prevent contamination of food, equipment, utensils, linens, and single-service and single-use articles. **2013 U.S. Food Code: 2-304.11**

**(D.2.6)** Food service employees/workers are required to wear hair restraints such as hats, hair coverings or nets, beard restraints, and clothing to keep their hair from contacting exposed food; clean equipment, utensils and linens. **2013 U.S. Food Code: 2-402.11**

**(D.3.1)** Refrigerated, potentially hazardous food deliveries are checked on delivery to ensure compliance with Food Code. **2013 U.S. Food Code: 3-202.11, 3-202.15**

**(D.3.2)** Food is stored in a manner compliant with Food Code. **2013 U.S. Food Code: 3-3**

**(D.3.3)** Food is protected from contamination from equipment, utensils, and linens in a manner compliant with Food Code. **2013 U.S. Food Code: 3-305.11, 3-305.12**

**(D.4.2)** Ware washing (dishwashing) machines are operating within designed specifications and/or in a manner compliant with Food Code**. 2013 U.S. Food Code: 4-204.113, 4-204-114, 4-204.115, 4-204.117, 4-204.118, 4-204.119, 4-501.110, 4-501.112, 4-501.113, 4-501-114, 4-501.116**

**(D.4.9)** Food service equipment shall be cleaned, maintained in good repair and in a manner compliant with Food Code. **2013 Food Code: 4-501.11, 4-501.12, 4-501.14**

**(D.4.13)** Equipment, Food-Contact Surfaces, and Utensils shall be clean to sight and touch. **2013 U.S. Food Code: 4-601.11a**

**(D.4.14)** The food-contact surfaces of cooking equipment and pans shall be kept free of encrusted grease deposits and other soil accumulations. **2013 U.S. Food Code: 4.601.11b**

**(D.4.15)** Nonfood-contact surfaces of equipment shall be kept free of an accumulation of dust, dirt, food residue, and other debris**. 2013 U.S. Food Code: 4.601.11c**

**(D.4.16)** Equipment, food-contact surfaces, utensils, cooking equipment, baking equipment, non-food contact surfaces, and linens, shall be cleaned in frequency and method compliant with Food Code. **2013 U.S. Food Code: 4-602.11, 4-602.12, 4-602.13, 4-603.11, 4-603.12, 4-603.13, 4-603.14, 4-**



**603.15, 4-603.16, 4-603.17, 4-701.10, 4-702.11, 4-703.11, 4-801.11, 4-802.11, 4-803.11, 4-803.12, 4-803.13**

**(D.4.19)** Food Service equipment, utensils, linens, and single service and single use articles are stored in a manner compliant with Food Code. **2013 U.S. Food Code: 4-903.11, 4-903.12, 4-904.11, 4-904.12, 4-904.13**

**(D.5.1)** Detainee meal menus and religious diets are reviewed annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. **4-ALDF-4A-07**

**(D.5.4)** Menu evaluations are conducted at least quarterly by food service supervisory staff to verify adherence to the established basic daily servings. **4-ALDF-4A-07**

**(D.5.6)** Three meals, including at least two hot meals, are provided at regular times during each 24-hour period, with no more than 14-hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands provided basic nutritional goals are met. **4-ALDF-4A-18**

**(D.5.7)** Therapeutic diets are provided as prescribed by appropriate clinicians. **4-ALDF-4A-09**

**(D.5.9)** Special diets are provided for detainees whose religious beliefs require the adherence to religious dietary laws when approved by the facility chaplain. **4-ALDF-4A-10**

## Restrictive Housing

**(E.1.1)** Frequency and cumulative length of restrictive housing placement. **DOJ-Restrictive Housing Report**

**(E.2.1)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(E.3.1)** Compliance with restrictive housing policies is reflected in the employee-evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(E.4.1)** Correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics. **DOJ-Restrictive Housing Report**

**(E.5.2)** If a detainee with serious mental illness is placed in restrictive housing: **DOJ-Restrictive Housing Report**
**(E.5.2b)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing.
**(E.5.2c)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts face- to- face clinical contact with the detainee, to monitor signs of deterioration.



**(E.6.1)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape, or posing a threat to institutional safety by encouraging others to engage in such conduct. **DOJ-Restrictive Housing Report**

**(E.6.7)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. **DOJ-Restrictive Housing Report**

**(E.7.2)** Policy identifies the conditions in which a detainee may be placed in restrictive housing in response to an alleged disciplinary violation. Such placement are limited to an investigation into those offenses for disciplinary segregation is an approved sanction. (Offenses involving violence, escape, or a threat to institutional safety by encouraging others to engage in such misconduct.) **DOJ-Restrictive Housing Report**

**(E.7.3)** Policy prohibits the placement of juveniles in restrictive housing. **DOJ-Restrictive Housing Report**

**(E.7.5)** Detainees are not placed in restrictive housing unless correctional officials conclude, based on evidence, that no other form of housing will ensure the detainee's safety and the safety of staff, other detainees and the public. **DOJ-Restrictive Housing Report**

**(E.7.9)** Detainees with serious mental illness are not placed in restrictive housing, unless: **DOJ-Restrictive Housing Report**

**(E.7.9b)** In disciplinary circumstances, the detainee's lack of responsibility due to mental illness or mitigating factors related to the mental illness should also preclude the detainee's placement in restrictive housing.

**(E.7.10)** If the detainee with serious mental illness is placed in restrictive housing: **DOJ-Restrictive Housing Report**

**(E.7.10c)** The detainees receive enhanced opportunities for in-cell and out-of- cell therapeutic activities and additional unstructured out-of-cell time, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, other detainees and the public.

**(E.7.11)** Unless medical attention is needed more frequently, all detainees in restrictive housing receives a daily visit from a qualified health care provider. The presence of a health care provider in restrictive housing is announced and recorded.

**(E.7.13)** After 30 days in restrictive housing, and every 30 days thereafter, all detainees in restrictive housing receives a face-to-face psychological review by mental health staff. **DOJ-Restrictive Housing Report**

**(E.7.14)** A detainee's initial and ongoing placement in restrictive housing is reviewed every seven days by a multi-disciplinary staff committee, which includes facility leadership and medical and mental health professional. **DOJ-Restrictive Housing Report**



**(E.7.16)** For every detainee in restrictive housing correctional staff develop a clear plan for returning the detainee to less restrictive conditions as promptly as possible. This plan is shared with the detainee, unless doing so would jeopardize the safety of the detainee, staff, other detainees, or the public.
**DOJ-Restrictive Housing Report**

**(E.7.17)** Detainees placed in restrictive housing for preventative purposes are provided an opportunity to participate in a step-down program to allow them to progress to less restrictive housing.
**DOJ-Restrictive Housing Report**

**(E.7.20)** Restrictive housing units provide living conditions that approximate those of the general detainee population. All exceptions are clearly documented. **4-ALDF-2A-51**

**(E.7.23)** Detainees in restrictive housing receive daily visits from the facility administrator or designee, and weekly visits from members of the program staff.

**(E.7.24)** Staff assigned, on a regular basis, to work directly with detainees in restrictive housing are selected based on criteria that includes:

**(E.7.24c)** Suitability for the population
**(E.7.24d)** Specialized training which includes: (1) a review of restrictive housing policy and procedures, and (2) identifying and reporting signs of mental health decomposition of detainees in restrictive housing. **DOJ-Restrictive Housing Report**

**(E7.26)** Staff operating restrictive housing units maintain a permanent log that contains at a minimum the following for each detainee admitted to restrictive housing:

**(E.7.26f):** Tentative/actual transition date

**(E.7.29)** Written policy, procedure, and practice that all detainees in restrictive housing are provided suitable clothing, and access to basic personal items for use in their cell unless there is imminent danger that a detainee or any other detainee(s) will destroy an item or induce self-injury. **4-ALDF-2A-56-1**

**(E.7.30)** Detainees in restrictive housing unit have the opportunity to shave and shower at least three times per week. Detainees in restrictive housing units receive and exchange clothing, bedding, and linen on the same basis as detainees in general population, exceptions are permitted only when determined to be necessary. Any exception is recorded in the unit log and justified in writing. **4ALDF-2A-58**

**(E.7.31)** When a detainee in restrictive housing is deprived of any usual authorized item or activity, a report of the action is made and forwarded to the facility administrator or designee. **4-ALDF-2A-58**

**(E.7.32)** If a detainee uses food or food service equipment in a manner that hazardous to self, staff, or other detainees, alternative meal service may be provided. Alternative meal service is on an individual basis, is based on health or safety considerations only, meets basic nutritional requirements, and occurs with the



written approval of the facility administrator or designee and responsible health authority. The substitution does not exceed seven days. **4-ALDF-2A-59**

**(E.7.33)** Detainees in restrictive housing units can write and receive letters on the same basis as detainees in general population. **4-ALDF-2A-60**

**(E.7.34)** Detainees in restrictive housing units have opportunities for visitation unless there are substantial reasons for withholding such privileges. All denials for visitation are documented. **4-ALDF-2A-61**

**(E.7.36)** Detainees in restrictive housing units have access to reading materials. **4-ALDF-2A-63**

**(E.7.37)** Detainees in restrictive housing units are offered a minimum of one hour of exercise five days a week outside their cells, unless security or safety considerations dictate otherwise. **4-ALDF-2A-64**

**(E.7.38)** In addition to the minimum of recreation, the multi-disciplinary committee identifies ways to increase out-of-cell opportunities for recreation, education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees. **DOJ-Restrictive Housing Report**

**(E.7.40)** Detainees in restrictive housing have access to programs and services that include, but are not limited to the following:

**(E.7.40a)** Educational services
**(E.7.40b)** Commissary services
**(E.7.40c)** Library services
**(E.7.40e)** Religious guidance
**(E.7.40g)** Telephone access

**(E.7.41)** Data is available about several aspects of restrictive housing units. This data includes: **DOJ-Restrictive Housing Report**

**(E.7.41a)** Total number of each type of restrictive housing placement
**(E.7.41b)** Restrictive housing recidivism rates
**(E.7.41c)** Average length of restrictive housing placement
**(E.7.41d)** Demographic information of detainees placed in restrictive housing to include: race, national origin, religion, gender identity, sexual orientation, disability, and age.

## Safety and Sanitation

**(F.1.1)** The facility conforms to all applicable federal, state, and/or local fire safety codes; in addition to those set forth by the National Fire Protection Association (NFPA), and the Occupational Safety and Health Administration (OSHA).

**(F.1.2)** The facility's fire prevention regulations and practices ensure the safety of staff, detainees, and visitors. These include, but not limited to: 4-ALDF-1C-08
**(F.1.2a)** An adequate fire protection service;



**(F.1.2b)** Availability of fire hoses or extinguishers at appropriate locations throughout the facility.

**(F.1.5)** The facility fire safety inspection includes: **4-ALDF-1C-09**
**(F.1.5a)** A weekly fire and safety inspection of the facility by a qualified departmental staff member;
**(F.1.5b)** A comprehensive and through monthly inspection of the facility by a qualified fire and safety officer for compliance with safety and fire prevention standards.
**(F.1.5c)** An annual inspection by local or state fire officials.

**(F.1.6)** Fire safety equipment is tested at least quarterly. **4-ALDF-1C-09**

**(F.1.7)** Facility furnishings meet fire safety performance requirements. **4-ALDF-1C-10**

**(F.1.8)** An evacuation plan is used in the event of a fire or major emergency. The plan is approved by an independent outside inspector trained in the application of national fire safety codes and is reviewed annually, updated if necessary, and reissued to the local fire jurisdiction. The plan includes the following: **4-ALDF-1C-02**
**(F.1.8a)** The evacuation plan does not identify the location of building/room floor plan.
**(F.1.8b)** The evacuation plan does not identify use of exit signs and directional arrows for flow of traffic.
**(F.1.8c)** The evacuation plan does not identify location of publicly posted plan.

**(F.1.10)** The facility has exits that are properly positioned, are clear from obstruction, and are distinctly and permanently marked to ensure the timely evacuations of detainees and staff in the event of fire or other emergency. **4-ALDF-1C-04**

**(F.1.11)** Fire drills are conducted **(NFPA Life Safety Code 101 Section 4.7)**:

**(F.1.11a)** Fire drills conducted monthly or with sufficient frequency that observed fire drills demonstrate fire drill procedures are a matter of routine.
**(F.1.11b)** Fire drill locations and times are varied and unexpected.
**(F.1.11c)** Fire drills are documented and evaluated.

**(F.1.13)** The use and storage of flammable, toxic, and caustic chemicals include:
**(F.1.13a)** Controlled access
**(F.1.13b)** A current inventory
**(F.1.13c)** Material Data Safety Sheets
**(F.1.13d)** Personal Protective Equipment
**(F.1.13e)** Staff and detainee safety training

**(F.2.1)** The facility is kept clean and in good repair. A housekeeping and maintenance plan address all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and detainees. **4-ALDF-1A-04**

**(F.2.2)** The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected. The following inspections are implemented: **4-ALDF-1A-01**



**(F.2.2a)** Weekly sanitation inspection of all facility areas by a qualified department staff member.
**(F.2.2b)** Comprehensive and thorough monthly inspection by a safety/sanitation specialist.

**(F.2.4)** Vermin and pests are controlled through monthly inspections and treatment by a qualified pest control technician. **4-ALDF-4D-04**

**(F.2.7)** The facility's potable water source and supply, whether owned and operated by the public water department or the facility, is certified at least annually by an independent, outside source to be in compliance with jurisdictional laws and regulations. **4-ALDF-1A-07**

**(F.2.8)** A program exists to monitor environmental conditions of the facility. This program ensures:

**(F.2.8b)** A ventilation system supplies at least 15 cubic ft. per minutes of circulated air per occupant with a minimum of five cubic ft. per minute of outside air. Toilet rooms, and cells with toilets, have no less than four air changes. Air quantities are documented by a qualified technician not less than once every three years. **4-ALDF-1A-19**
**(F.2.8c)** Noise levels in detainee housing do not exceed 70 dBA (A scale) in daytime and 45 dBA (A scale) at night. Measurements are documented by a qualified, independent source and checked not less than every three years. **4-ALDF-1A-18**

**(F.2.10)** The number of detainees does not exceed the facility's rated bed capacity. **4-ALDF-1A-05**

**(F.2.11)** Detainee sleeping surfaces and mattresses are 12 inches off the floor.

**(F.2.12)** Detainees are provided a place to store clothes and personal belongings.

**(F.3.2)** Detainees are issued clean well-maintained clothing items in a sufficient quantity of each item, or provided an opportunity to exchange or have laundered, each item on a weekly equivalent basis:

**(F.3.2a)** Detainees are issued clean well-maintained clothing in a sufficient quantity of each item, or provided an opportunity to exchange, or have laundered, each item on a weekly equivalent basis: Two outer garments (two shirts and pants, or two jumpsuits).
**(F.3.2b)** Seven pairs of underwear.
**(F.3.2c)** Seven pairs of socks.

**(F.3.6)** Detainees are issued one mattress, not to include a mattress with integrated pillow.

**4-ALDF-4B-02**

**(F.4.1)** Detainees have access to toilets and washbasins with temperature controlled hot and cold running water 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas. **4-ALDF-4B-08**

**(F.4.2)** Detainees have access to operable showers with temperature controlled hot and cold running water. **4-ALDF-4B-09**

**(F.4.5)** Detainees have access to hair care services. Hair care tools and equipment are cleaned and disinfected. **4-ALDF-4B-07**



**Services and Programs**

**(G.2.2)** Detainee access to counsel is ensured. Detainees are assisted in making confidential contact with attorneys and their authorized representatives. Such contact includes, but is not limited to **(4-ALDF-6A-02)**:
**(G.2.2.a)** Telephone communications

**(G.3.5)** Excluding weekends and holidays or emergency situations, incoming and outgoing letters are held for no more than 24-hours, and packages are held for not more than 48-hours. **4-ALDF-5B-10**

**(G.5.2)** There is a chaplain with the minimum qualifications of clinical pastoral education or equivalent specialized training, and endorsement by the appropriate religious-certifying body. The chaplain assures equal status and protection for all religions. 4-ALDF-5C-19

**(G.5.5)** When a religious leader of a detainee's faith is not represented through the chaplaincy staff or volunteers, the religious coordinator and chaplain assist the detainee in contacting such a person. That person must have the appropriate credentials from the faith's judiciary and may minister to the detainee under the supervision of the religious coordinator or chaplain.
**4-ALDF-5C-22**

**(G.6.1)** Detainees have access to exercise opportunities and equipment, including at least one-hour daily of physical exercise outside the cell and outdoors, when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.) **4-ALDF-5C-01**

**(G.6.2)** Detainees have opportunities to participate in leisure-time activities outside their respective cell or living room on a daily basis. **4-ALDF-5C-02**

**(G.8.7)** Detainees are compensated for work performed. **4-ALDF-5C-12**

**(G.9.1)** A grievance procedure is made available to all detainees and includes at least one level of appeal. **4-ALDF-6B-01**

**(G.9.2)** Grievance forms are readily available and easily accessible to detainees.

**(G.9.4)** Detainee's grievance forms provide the opportunity for detainees to retain a copy of the grievance filed.

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**Incidents**

|  | Grand Total | Total with a Weapon |
|---|---|---|
| Number of inmate assaults on staff in past 12 months: | 14 | 0 |
| Number of inmate assaults on other inmates in the past 12 month | 11 | 3 |
| Number of staff assaults on inmates in the past 12 months: | 1 | 0 |
| Number of assaults on visitors in the past 12 months: | 0 | 0 |
| Number of attempted suicides in the past 12 months: | 55 | 0 |
| Number of completed suicides in the past 12 months: | 3 | 0 |
| Number of attempted escapes in the past 12 months: | 16 | 0 |
| Number of completed escapes in the past 12 months: | 0 | 0 |
| Number of detainee PREA incident in the past 12 months: | 52 | 0 |

**Capacity**

| Capacity Metrics: Facility |  |
|---|---|
| Total Capacity: | 1765 |
| Adult Male Capacity: | 1455 |
| Adult Female Capacity: | 310 |
| Total Juvenile Capacity: | 26 |
| Juvenile Male Capacity: | 21 |
| Juvenile Female Capacity: | 5 |
| Disabled Capacity: | 88 |
| Description for Disabled Capacity: | Hospital beds and low bunks |

| Capacity Metrics: USMS | Maximum | Minimum |
|---|---|---|
| Total Capacity: |  | 75 |
| Adult Male Capacity: |  | 60 |
| Adult Female Capacity: |  | 10 |
| Total Juvenile Capacity: |  | 0 |
| Juvenile Male Capacity: |  | 0 |
| Juvenile Female Capacity: |  | 0 |
| Disabled Capacity: |  | 10 |
| Description for Disabled Capacity: | Hospital beds and low bunks | |

| Capacity Metrics: ICE | Maximum | Minimum |
|---|---|---|
| Total Capacity: |  | 0 |
| Adult Male Capacity: |  | 0 |
| Adult Female Capacity: |  | 0 |
| Total Juvenile Capacity: |  | 0 |
| Juvenile Male Capacity: |  | 0 |
| Juvenile Female Capacity: |  | 0 |
| Disabled Capacity: |  | 0 |
| Description for Disabled Capacity: | N/A | |

## General Overview by Functional Area

**A - Administration and Management**                    **Unsatisfactory ("At-Risk")**

Review of Administration and Management is based on review of policies, procedures, supporting documentation, direct observation, and interviews with staff and detainees/inmates. All facilities operate under CCCC's limited policies and procedures and there are no site-specific procedures for the facility's management of USMS detainees. All facets of the operation are not addressed in policy as required by FPBDS. Examples include: no written policy and procedure for policy development, annual policy review/updates, and employees' and detainees'/inmates' access to policies and procedures; the "Red Zone" system or the temporary lockdown of detainees/inmates when security staffing levels are insufficient to ensure detainees/inmates safety and required supervision of the population; and grievance procedures described in the detainees'/inmates' handbook is completely inconsistent with facility's policy.

Policies and procedures are accessible to staff through hard copy manuals available in each control room and electronically on the My Human Resources (MY HR) website. Policies and procedures which do not present security concerns have not been identified and are not available to detainees/inmates. No convincing documentation was made available to verify or prove the CCCCs annual policies and procedures are reviewed/updated annually as needed or required.

There is no internal quality control plan in place to provide an annual review of CCCCs operations to ensure compliance with CCCCs policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was conducted on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCCs staff did not comply, address or provide corrective actions for identified deficiencies which included; exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review.

A review of housing unit logs and detainee interviews reveal the Warden and Associate Wardens do not consistently make weekly visits to housing units and visits are not documented.

There is no centrally located detainees/inmates record; detainees/inmates records are maintained in various locations. The facility only maintains electronic booking and screening information entered in the Jail Management System (JMS) during intake. Detainees/inmates legal documents or criminal files are maintained in the Sheriff's Records department. Documents such as cash receipts, disciplinary actions, grievances, and program participation are maintained in other areas by various staff members. The contents of detainees/inmates records is not separated or maintained in a standardized format as required by CCCCs facility policy. The frequency and cumulative length of RHU placement is not included or documented in any files. Detainees'/inmates criminal records are located in a secure area with no public access.

Intake staff interviews confirm staff review arrest documents including the USM-129 Individual Custody Detention Report and USM-130 Prison Custody Alert Notice, enters basic personal information and completes intake screening interviews. During the intake process detainees/inmates are escorted to medical department's intake screening area where medical staff conduct medical, dental, mental health and suicide assessments. Medical staff is responsible for conducting the history of sexual aggression and risk of sexual victimization vulnerabilities within 24-hours of a detainees/inmates arrival.

Detainees/inmates, except for the Cleveland City inmates, upon intake are searched, provided an opportunity to a shower, issued clothing, linens and hygiene items, shown a PREA video and issued a CCCC handbook. Due to the short stay of Cleveland City inmates, they remain in their person clothing and are housed separate from other detainees/inmates. Handbooks describing facility rules and sanctions are only provided in English, the CCCC detainees/inmates handbook is not available in Spanish; detainees/inmates acknowledge receipt of the handbook in writing. The CCCC detainees/inmates handbooks issued at Jail I (Bedford) and Jail II (Euclid) are dated June 2017, and is outdated and does not contain all pertinent information detainees need to successfully adjust to the facility. The information provided on how to file a grievance is not consistent with the current policy. The handbook issued at the Euclid Jail Annex, are dated January 2016.  Prior to placement in general population housing, detainees/inmates are temporarily housed in an Orientation unit until medically cleared. Intake policy and procedures review along with staff and detainees/inmates interviews reveal detainees/inmates are not provided a detailed orientation while in the Orientation unit. There is no policy requiring staff to read or explain the handbook to detainees/inmates who cannot read or understand English.

Detainees'/inmate's personal property and monies is inventoried upon intake, and a copy of the itemized inventory is given to the detainee/inmate. Due to insufficient detainees/inmates personal property storage space, detainees/inmates' personal property is stored in three separate locations. Non-clothing personal property items and small items are stored in one property room while clothing items, footwear and other larger items are stored in another property room. A third property room contained soiled clothing in plastic bags awaiting cleaning. Personal property storage areas were observed and found to be disorderly, and the tracking system is complicated and not easy to follow. The current multiple storage areas do not ensure the safety and security of detainees'/inmates' personal property.

Direct observation and staff interviews reveal CCCC custody staff do not release USMS detainees. Once staff confirm a USMS detainees' identification and perform a search of the detainees in Intake, detainees are released directly to the USMS. Upon verifying inmates' release documents, staff confirm positive identification and inmates are released. Detainees/inmates are released directly from RHU to the community.

Detainees/inmates with disabilities are generally housed in the medical housing area which can accommodate wheel chairs. Interviews with detainees/inmates with disabilities and staff reveal programs and service areas such as outside recreation is not accessible to detainees/inmates with limited mobility or disabilities.

Programs and work opportunities for female detainees/inmates are comparable to male detainees however USMS detainees are not afforded the opportunity to participate in the CCCCs work programs. Inmates are not monetarily compensated for work.
Staff receive pre-service training on cultural and ethnic sensitivity.

Review of the CCCCs annual staffing analysis reveal essential posts and positions are not identified; currently, there are 96 correctional officer vacancies. As a result of a high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding providing for detainees'/inmate's basic needs. To address staffing shortages and call outs CCCC implemented a "Red Zone" system whereby detainees/inmates are confined to their cells for periods of 27+ hours and not let out during times they normally have access to dayrooms, showers, telephones and outside recreation areas. A housing unit log book and detainee/inmate interviews indicate the "Red Zone" system was in effect in one housing unit for 12 days in a row. CCCC does not have a policy or written directive outlining specific procedures for the "Red Zone" system.

An interview with the Cuyahoga County Sheriff's Human Resource staff and a review of several personnel documents confirm background investigations are conducted for all employees and contractors. Background checks include: employment reference checks; verification of citizenship; pre-employment interviews; and drug screenings. Credit history checks, re-investigations and pre-employment physicals are not conducted. A review of the performance evaluations for Special Response Team (SRT) members who work exclusively in the RHUs, do not reflect compliance with restrictive housing policies as required for staff assigned to RHU.

New employee receive an orientation prior to assuming their duties. Orientation training includes all topics required by FPBDS. During orientation training, staff sign and acknowledge receipt of the code of ethics which describes ethical rules, prohibited acts, disciplinary sanctions and staff requirements. The Cuyahoga County Sheriff's Office provides a hotline for employees to confidentially report misconduct by other staff and/or detainees.

The Training Manager has received specialized training including an 80-hour Instructional Skills training course. Newly hired Correctional Officers receive at total 143 training hours of basic classroom training and 80 hours of field training during their first year of employment for a total of 226 hours. However, correctional implications of young adults (18-24) brain development and associated de-escalation tactics are not included in the curriculum for staff assigned to RHU. CCCC facilities base their staff training requirements on the Ohio Rehabilitation and Corrections Bureau of Adult Detention's Minimum Adult Detention Standards which only require eight hours of in-service training annually instead of 40 hours as required by FPBDS. As a result, Correctional Officers do not receive annual training on the following topics: security/safety/fire/medical emergency procedures; and supervision of offenders including training on sexual abuse and assault.

Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention



Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter.

New professional staff and support employees receive 40 hours of training prior to being independently assigned to a particular job however, they only receive two hours of annual training. FPBDS requires 40 hours of annual in-service training to include: security procedures and regulations; supervision of detainees/inmates; signs of suicide risks; suicide precautions; use of force regulations and tactics; report writing; detainees'/inmates' rules and regulations; key control; rights and responsibilities of detainees/inmates; safety precautions; and social cultural life styles of the detainee/inmate population.

Review of emergency plans confirm specific plans for emergency situations are in place except for disturbances. CCCC does not have written support agreements with external entities to provide emergency assistance as identified in the CCCC emergency plans.

There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications.

Interviews with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management.


**B - Health Care**                                                    **Marginal ("At-Risk")**

Review of health care at CCCC is based on review of facility's policies and procedures, supplied relevant documents, staff interviews, review of electronic health records (EHRs), direct observation and tracing methodology. There are 65 allocated positions in the Medical department.  These positions are staffed by county employees and MetroHealth (MH) contract staff. MetroHealth also supplies telemedicine services for psychiatry and other specialties.

As of September 2018, a temporary staffing company, EduCare Medical Staffing, provides staff for vacant clinical positions, as needed. The healthcare positions include an Administrative Director, a Clinical Director, a Health Service Administrator, a Director of Nursing, a Physician, a Behavioral Health Physician, a Physician's Assistant, Mental Health Nurse Practitioners, two Clinical Nurse Practitioners,  twenty-one Nurses, fourteen Licensed Practical Nurses, six Medical Technical Assistants,  a Radiology Technician, an Ultrasound Technician, an Paramedic, a Dentist, a Dental Hygienist, a Dental Assistant, a Pharmacist, two Pharmacy Technicians, three Medical Records Representatives and two Clerks. Physical Therapy is provided through a personal contract. Optometry is provided by MetroHealth off site.

The Administrative Director is the designated health authority.  The Clinical Director has sole province of the clinical decisions.  An interview with the health authority and the HSA and review of available files, reveal not all files are maintained in the Medical department, nor were provided



to reviewer.  There are no job descriptions for the Pharmacy staff, Physical Therapist or the Mental Health Nurse Practitioner. Files presented for review contained personnel documentation such as disciplinary actions and personal leave. In October 2018, ten new nurses were hired and are receiving on the job training. None of the newly hired nurse's files or of the files of the Pharmacy staff were available for review. The files made available for review reveal: 1 medical staff had expired CPR certifications; four have expired licenses; one Licensed Practical Nurse has no license on file; one Medical Technical Assistant did not have a diploma; two EduCare nurses had partial CPR certifications; and one Licensed Practical Nurse and one Nurse Practitioner have board actions on their verification but no documentation of the disposition. A National Practitioner Data Bank query is not used for health care professional disciplinary or sanctions inquiries

The CCCC' Medical department is staffed 24/7 and includes the satellite jail facilities of Bedford and Euclid. A physician, psychiatrist, mental health practitioner and dentist are available on call. Male and female detainees/inmates are seen in the dispensary on the 6th floor at the main CCCC facility. The satellite Bedford and Euclid facilities only have male detainees/inmates, detainees/inmates in these facilities are seen in each facilities respective medical offices. The dispensary has several holding cells, exam rooms, radiology, treatment room and dental office. There is also a female dispensary next to the female housing unit on the 6th floor which was not open at the time of the review. Moreover, a mental health dispensary is located on the 7th floor; Sanitation on the 7th floor mental health dispensary was minimally acceptable.

Examination of the policies and procedures reveal they are not updated and there is no documentation of an annual review.  According to the health authority, policies and procedures are available to staff on line.  Hardcopies of policies and procedures are not available in case of computer failure. The quality management program or Continuous Quality Improvement (CQI) Program, has not had a meeting in the past year.  There is no documentation of monitored health care aspects nor corrective actions of problems identified by staff and Pharmacy and Therapeutic (P&T) meetings. Review of the past three quarterly P&T meeting minutes identified problems with medication delivery and duplication of orders by providers. The annual training program confirm medical staff is trained to respond to health-related situations within four-minutes. Correctional staff receive respond to health-related situation training every two years.

There are four designated sealed first aid kits in the facility and one in each satellite facility (Bedford and Euclid). The Medical department has an automated External Defibrillator (AED) with their emergency equipment at the facility and three at Bedford. The AED at Bedford is not checked daily or its operability status documented.  Man-down drills are not conducted annually on each shift. Documentation presented contained only clinical tabletop exercises with no response action or evaluation. Direct observation of the fire drill/man down drill conducted during the review reveal first responding staff, the Safety Manager and a nurse, arrived within four minutes. The nurse did not attempt to assess the victim and start CPR. The Safety Manager started CPR.  On the suspicion of an overdose, the Safety Manager administered Narcan. The nurse did not respond to this suspicion however, nurses do not carry Narcan on their person. Subsequent medical staff arrived within five minutes with a gurney, oxygen, AED and emergency bag. One of the nurses took charge and the victim was prepared for evacuation.

In 2015 the CCCC began using electronic health records (EHR); a system called EPIC, which was implemented by MetroHealth. Through observation and interviews with staff, it was revealed detainees/inmates chronic care and/or urgent care rosters cannot be generated; chronic care clinics cannot be flagged and EHR has no ability to print documents.  There is no alternate plan if the system is down or if the contract with MH is terminated. Confidentiality of medical information is maintained.

Medical staff complete intake screenings within 24 hours of detainee's/inmate's admission to the facility. The screening probes into past medical history, chronic illness, mental status and present condition, history of sexual aggression and risk of sexual victimization. The screenings reviewed did not indicate disposition if a detainee/inmate is cleared for general population housing however a nurse interviewed stated "it's assumed".

Inmates admitted and held for the City of Cleveland on the 3rd floor, are not afforded the process of screening by medical. Medical is made aware of an inmate's health need only when the need, issue or situation digresses to urgent or emergency, such as a diabetic inmate who has not had his/her insulin for four days, or others who become symptomatic due to not having hypertensive or psychotropic medications.

Medical staff stated a language line, through Metro Health, is used for non-English speaking detainee/inmate interviews.  The detainees/inmates handbook is available only in English, there is no  there is no written material available for limited English speaking or non-English speaking detainees/inmates to explain how to access medical care and services or the procedures at the facility.

A Mental Health screening and Tuberculosis (TB) screening and testing is performed within 72 hours of the detainee's/inmate's admission.

Comprehensive medical and mental health appraisals are not conducted within 14 calendar days of detainee's/inmate's arrival. A review of the EHR of 25 detainees from the facility roster demonstrated eight were not completed within 14 calendar days. Recommendations for job assignments, housing or program participation are not noted. Only detainees/inmates with referrals to the physician or mental health practitioner are documented in the EHR. Appraisals with positive findings and medication are signed off by the CD/physician. Detainees/inmates on medication are provided with current prescriptions. The dentist or qualified dental staff do not conduct 14 calendar day oral screenings. When a detainee/inmate requests dental services, an oral exam is done which includes examination of teeth, gums and dental hygiene instructions.

Detainees/inmates request medical/dental care by submitting a request form known as "Kite". The detainee/inmate deposits the "Kite" request in a box. Clerical staff collect the "Kites" daily, sorts them and leave the "Kites" for medical staff to pick up in the 4th floor control room. Medical staff review the medical request "Kites" and process them accordingly (i.e. sick call appointment or medication renewal). The "Kite" is then scanned into the EHR. Presently, there is a back log of "Kites" to be scanned and entered in the EHR. Information in the detainees/inmates handbook explaining how to access health service, is not available in Spanish; however, Spanish is spoken by a significant number of detainees/inmates. The co-payment fee at CCCC was abolished in 2017, yet



service fee signs are still posted throughout the facility. Interview with the health authority confirmed the USMS is not contacted for pre-authorization of detainees' non-emergency outside care.

CCCC does not have an infirmary. Detainees needing this type of monitoring are sent to Metro Health. Random detainee/inmate chart review reveal chronic care clinics are not flagged nor identified in the EHR. A roster of chronic care clinics cannot be generated. The health authority does not maintain a list of chronic care patients and could not produce one. There is no proactive program to discuss and implement an individually tailored plan for special needs patients which include, but are not limited to: developmentally disabled individuals, frail/elderly, physical impairments and serious mental health needs. Furthermore, adolescents fall into this category because during this period they require special attention to diet, exercise and nutrition. A list of special needs patients could not be produced.  Juvenile detainees/inmates are not receiving special attention to diet, exercise and nutrition; and a request for an increased caloric diet for juvenile detainees/inmates in not sent to the Food Service department by medical, even when medical staff is aware the detainee/inmate is a juvenile.

CCCC does not have an on-site Obstetric/Gynecologist (OB/GYN) physician. The county's OB/GYN physician resigned in June 2018. Females are seen for prenatal at Metro Health.  Women needing gynecological services beyond the medical staff capacity are sent to Metro Health. Female charts reviewed reflected gynecological exams comparable to community standards. Two known pregnant females were interviewed. One is 32 weeks pregnant and the other one is five months pregnant and sleeps on the floor. It was confirmed both have seen the OB/GYN appropriate times. Interview with the health authority reveal pregnant females receive pre-natal vitamins and a request for an increased caloric diet is sent to the Food Service department.

The infectious disease program tests for communicable diseases such as tuberculosis, MRSA, sexually transmitted diseases like gonorrhea and chlamydia, hepatitis and HIV. Interview with medical staff and chart review reveal a compliant infectious disease program. The list for annual tuberculosis testing is created manually by reviewing the electronic charts since there is no method of creating an electronic list in EPIC. This increases the risk of missing a detainee/inmate for testing.  The facility has a negative pressure room however, it is not operational.

Biohazard waste or infectious waste (IW) is processed by the company Advantra. IW is collected from the medical department by a custody staff and taken to the 5th floor mechanical room for packaging and storage until pick up.  Pick up is scheduled twice a month. The IW bags and full sharp containers are placed directly in a carton box and stored in an open area. This violates local, state and federal regulations which requires all IW to be stored in a manner which maintains the integrity of the package, i.e. off the floor, and the storage area must be clearly marked IW and locked.  CCCC's IW is not properly packaged for off-site transport; for IW to be transported off-site it must be placed inside a second sealed plastic bag or one single bag within a fully enclosed, rigid, sturdy container.

Detainees identified as needing detoxification or chemical dependency treatment, manageable at the facility, are monitored and treated per Substance Abuse and Mental Health Services Administration (SAMHSA).

Pharmacy service is provided by an onsite pharmacist. Medications are obtained through Metro Health. Tour of the pharmacy reveal a non-formulary procedure and a procedure for providing medication orders. The pharmacy has an automated dispensing machine, Pyxis, for all controlled substances. Main stock and Pyxis count of various controlled substances was correct. Needles and syringes are not overseen by the pharmacy staff. The supply clerk orders needles and syringes electronically through a Metro Health Store Room inventory program to restock. When the clerk receives the order, the clerk places it in the locked cabinet in the dispensary. Medical staff withdraw needles and syringes as needed but do not sign them out on a log. A review of the syringe and hypodermic needle log reveal syringe and hypodermic needles are restocked however, no balance is indicated. The lack of a perpetual inventory makes it impossible to detect if needles or syringes are missing and poses a custody violation.

Three of the Medication Administration Records (MAR) reviewed contained numbers in lieu of initials. The nurse conducting the medication administration explained the numbers are codes for detainee/inmate missed medication; however, the nurse was not able to indicate where a legend for these codes could be located. Also, when detainees/inmates who are scheduled for court or change housing, their medication is not consistently processed. Training for medication administration is not thorough and consistent. Staff interviewed reveal training for medication administration is passed on. The release list of detainee/inmates indicate only detainees/inmates transferring to another facility are ordered a 7-day supply of medication. Experiments and investigational or experimental drugs, devices and procedures are not allowed.

All facility staff receive Suicide Prevention and Prison Rape Elimination Act (PREA) training. In addition, medical staff receive hunger strikes, medical restraints, seclusion and detainee deaths training. There have been no hunger strikes or medical restraints used for the past year. Ten PREA investigative cases were reviewed and found compliant with sexual assault procedures.

The CCCCs suicide prevention program outlines the identification of suicidal detainees/inmates, intake/admission and housing procedures. CCCC had six deaths from June to October in 2016. One death was confirmed as a suicide. Debriefing reports or mortality reviews are not conducted. Required documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, autopsy reports were not available in the medical department; despite CCCC policy which requires aforementioned documentation be maintained in the medical department. Additionally, no information regarding the 6 inmates death was available or maintained in the Warden's office either.

Review of 15 Restrictive Housing (RH) charts reveal medical conducts a medical assessment of a detainee/inmate before they are placed in RH. Interview with the Mental Health practitioner reveal a detainee/inmate with a stable serious mental illness can be placed in RH for a rule violation. If the detainee/inmate is stable intensive, clinically mental health treatment is not provided for the



entirety of the detainee/inmates stay in RH, nor is a face-to-face conducted at least once a week. Review also denoted detainees/inmates are not kept in RH past 30 days.

**C - Security and Control**                                        **Marginal ("At-Risk")**

The Security and Control review is based on staff and detainee interviews, review of policies and procedures, post orders, and direct observation.

Main Control is staffed on a 24-hour basis with a sally port to control access.  The Main Control Room contains video surveillance monitoring, electronic locking systems, emergency keys, fire annunciator panels, perimeter alarms, radio communications, an intercom system, and tinting on windows. Observations of the sally port usage during the Facility Review reveal the Main Control officer operates ███████████████████████████████████████████████████████. Several times during the review process, ████████████████████████████████████████████████████████████████████████████████████████. Additionally, Main Control's ████████████████████████████████████████. A ████████████████████████████ This creates a concern if the control center staff become incapacitated.

Correctional Officer posts are located immediately adjacent to detainee living quarters ensuring continued observation of detainee activities and allows staff to quickly respond to emergencies. Officer's stations is centrally located in each housing unit to provide observation of detainee/inmate activity.

Detainees/inmates are escorted by correctional staff when moving about the facility, pat searched and screened with a magnetometer upon entering and exiting the housing unit.████████████████ ████████████████████████████████████████.

A permanent log is maintained at each correctional post, ensuring staff record all routine information, emergencies, and unusual incidents.  However, when reviewing logs for information regarding recent suicides no information was reflected. Investigative staff stated the logs were immediately confiscated and taken into evidence and replaced with new ones.  However, the new log did not mention the reason for replacement.

Weekly security inspections of all areas of the facility is not being conducted and staff do not perform daily security inspections upon assuming a post. According to staff, areas in need of repair are called into Main Control and Main Control staff then notify county maintenance personnel.  A record of such calls or incidents could not be provided. Additionally, correctional supervisors are not signing permanent logs on each shift indicating they have visited the area. There is no documentation of weekly rounds made by the Warden and other facility managers.

A population management system includes records on admissions, processing, and releases of detainees in the Intake area and Main Control via the IMACS system. The facility has a system of physically counting detainees, which also includes counting detainees outside of their assigned living areas. Nevertheless, there are no written procedures to specify how outcounts should be

conducted. CCCC conducts three formal counts within each 24-hour period (i.e., 0445, 1200, and 2200). There are no standing or face to photo (Bed Book) counts conducted.

Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.). ███████████████████████████████████████ ████████████████████████████████████████████████ .

Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of the Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black", based on their black para-military uniforms.

During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members direct at detainees/inmates.

SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches", as they escorted them to and from the interview location.  The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety.

CCCC does not use or maintain firearms however, the facility does use and maintain less-than-lethal equipment and chemical agents.  Chemical agents are properly controlled and stored as required. The facility does not use electrical disablers Storage space is provided for secure storage of less than lethal devices and security equipment in the Special Response Team (SRT) area located on the 5th floor.

Facility keys are not controlled, as indicated through observation by the team during the week. The lack of key control is pervasive throughout the facility, ████████████████████████████████ ██████████████████████████ Additionally, a daily accounting of facility keys is not conducted to ensure keys haven't been lost or stolen. Emergency keys are contained in a main control and other locations throughout the facility; however, there are no formal procedures in place to ensure strict accountability is maintained.

Security equipment in the SRT area is inventoried each shift to determine condition and expiration dates. Tools are not maintained in the facility. Tools are brought in by county maintenance crewman to repair various items within the facility, as needed. However, an inventory process is not in place to ensure accountability of those tools brought into the facility. Culinary tools and



equipment are stored and maintained in the Food Service department and inventoried as required. Detainee/inmate workers are issued tools to prepare meals however, there are no written procedures on the issuance of tools and equipment. Furthermore, inventories of medical and dental instruments, equipment, and supplies (syringes, needles, and other sharps) are not conducted to ensure these items are not removed by unauthorized persons.

Review of the detainee/inmate handbook reveal rules of detainee conduct specify acts prohibited within the facility and penalties which can be imposed.  Disciplinary hearings are normally conducted within 7 days of the detainee/inmate being notified of the charges against them.  An investigation is held within 24 hours of the time the violation is reported.

A secure area is provided in Intake for the processing, transferring, searching and applying and removing restraints.  Detainees are fully restrained during transportation, unless medically exempt. CCCC does not maintain a transportation fleet, as all transportation is conducted by the Cuyahoga County Sheriff's Department.

On Wednesday during the Facility Review, the entire team arrived in the "Bull Pen" area at approximately 6:00 a.m. to observe the processing and supervision of inmates. Upon arrival, approximately three correctional officers were assigned to this floor to provide supervision of the impending population. The routine staffing assignments for this location is four correctional officers (3 males and 1 female); however, a female officer called in and staff indicated when this occurs, the post is often left vacant. This creates a concern, as policy does not allow cross gender searches. ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Additionally, all inmates escorted to the "Bull Pen" area are escorted restraint free. Staff indicate they are often not aware of separation concerns.  Detainee/inmate names are called and upon an affirmative reply are moved from the corridor, to an assigned holding cell.

Detainees/inmates are not required to recite their register numbers, nor are they confirmed with a photo card.  Some detainees/inmates were observed not in possession of any identification and staff had no clear or consistent response to the question "How do you verify the identity of detainees/inmates who have the same last name".  This question was provoked, as the processes was being observed and staff called out a common Hispanic last name, to which there was more than one detainee/inmate present with the last name; on this occasion the detainees/inmates said "which one", and allowed the detainees/inmates to confirm (without positive verification) who the officer was allegedly calling for.  Based on the physical footprint of the area, four officers are not enough to provide adequate security in this area.

Staff and detainee/inmate interviews reveal the lighting in the court call staging hallway had only been repaired Tuesday, evening, and prior to this, there was only one operable hallway light.

Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or have access to running water, are stripped of all furnishing to include a place to sit, and were found to house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons. Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10 hours. ████████████████████████████████████████████████████████████████████████



██████████████████████████████████████████

█████████████████████████

Detainees/inmates interviews on Wednesday reveal detainees were fed 2 doughnuts and a carton of milk for breakfast prior to being placed in the holding cell. The breakfast received was woefully inadequate and met no medical or nutritional guidelines or standards.  Inspection of detainee/inmate court meals which were brought down to be fed to the detainee/inmates in the holding cells reveal baloney sandwiches were not individually wrapped, but rather 20 to 30 sandwiches packed in one bread loaf bag, the sandwiches not properly refrigerated or stored and were located in an unused office area which reeked of dead vermin.

An inmate was observed getting a haircut before going to court in the corridor prior to entering the Bull Pen area. Interview with the staff and detainee/inmate receiving the haircut reveal, detainee/inmates have no access to barbering and haircare in their living areas and as a last minute fix, detainees are provided a hasty pre-court appearance haircut in the hallway.  The hallway is not an appropriate area to ensure safety and sanitation for the barbering process.

█████████████████████████████████████████

█████████████████████████The keys were never affixed to the employee's person to reduce the possibility of them being compromised.

**D - Food Service**                                              **Unsatisfactory ("At-Risk")**

A review of the CCCC Food Service department is based on staff and detainee/inmate interviews, food service policies and procedures, and direct observation of operations. Policies and procedures are minimal and policies and procedures are not reviewed and updated annually.

The Food Service department staff consists of a Sergeant who manages the food service operation, a Corporal who serves as assistant manager, and eight civilian staff who supervise approximately 60 male detainee/inmate workers. Correctional Officers assigned to the department handle the security duties within the department. Food service staff working in the department have completed ServSafe certification in their respective areas including food service supervision, food preparation, safety and sanitation.

Policies and cleaning schedules have not been developed and posted to ensure sanitation of equipment and to ensure areas are cleaned in a frequent and consistent manner. Direct observation and food service operation inspection reveal lack of documentation, and no daily sanitation inspections are not conducted by the supervisory staff of the department.

All sheet pans are heavily encrusted with grease deposits and soil accumulation. Equipment and walls throughout the department have accumulated dirt and food debris. Food-contact surfaces of cooking equipment, serving pans and sheet pans inspection reveal baked-on food and encrusted grease on all pans.  Sanitation buckets are not used to keep areas clean and sanitized. Several pieces of equipment are non-operational. Vent hoods, filters and surrounding ceiling areas have



accumulated grease and dirt. Mice/vermin are present and were observed running in various throughout the foodservice areas.

The dish washing machine temperatures is not properly documented. The dishwashing machine was found with the wash tank temperature at 180 degrees which is above the manufacturer's requirement of 163 degrees. Food trays are not checked for cracks after being washed and many trays have water seeping inside the trays and causing unsanitary conditions. Insulated food trays are cracked, heavily stained, leaking molded and dirty water from cracks in the food tray perforated seal and is contributing to contamination of food product plated in unserviceable trays.

No gauges are visible on the pot and pan ware washing machine to verify required wash and rinse temperatures. Test strips are available if the need arises for the low temperature sanitation solution to be used. The State of Ohio, City of Cleveland-Department of Public Health conducted an inspection on August 17, 2018. The three violations identified were corrected on site during the inspection.

Food Service civilian staff are medical cleared to work in food service. However, there are no procedures or documentation in place indicating detainees receive a pre-assignment medical examination to work in food service. Staff and detainees/inmates are monitored daily for health and cleanliness. Staff and detainees/inmates are trained in hand washing procedures and are required to wash their hands upon entering the food service area, or when changing tasks during the work period.

Observation of staff and detainee/inmate workers reveals not all were appropriately wearing hair covering and beard guards. Additionally, detainee/inmate workers are not wearing proper foot wear for a food service environment. All detainee/inmate workers are wearing orange clog type footwear and some without socks.

Observation reveals that staff and detainees/inmates in areas outside of food service where food is served are not wearing gloves when handling food delivered.

Review of training documentation for Food Service staff and detainees/inmates reveal training is conducted and documented.

Observation of dry storage rooms and refrigerated and freezer areas reveal required food code temperatures are being maintained. However, all dry and refrigerated storage areas are cluttered and not organized. One of the freezer units has a frozen water leak on the condensing unit with food being stored underneath the leaking unit, creating cross contamination. Perishable food deliveries are not checked for proper temperature requirements by the vendor and there is no documentation to adequately document temperatures.

The facility utilizes a satellite tray feeding operation. Prior to meal service, hot foods are placed in pans and held in hot holding cabinets. Cold foods are placed in pans and placed in the cooler. Meals are then plated on insulated food trays and Correctional Officers deliver these trays within the required time frame to the various housing units. Approved menus are followed and ensures proper



food portioning is controlled. Observation of meal service reveal portion sizes are adequate and food temperatures are maintained and within the required ranges.

A two-week cycle menu is used for meal rotation.  A complete menu analysis of regular and religious diets is not conducted annually or certified to be nutritionally adequate by a registered dietitian. The general population menu provide for an average daily caloric intake of approximately 2800 calories. Substitutions to the menu are made in accordance with dietitian approved guidelines. Production worksheets document all meals served, recorded temperatures and special requirements.

The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration. There are no juvenile meal request for an increased caloric diet on file for juveniles housed in the facility in the Food Service department.

Detainees voiced concerns regarding the repetitious nature of the menu and the lack of variety and sufficiency of meals.  Meals are not well received by the detained population and no meal surveys are conducted to solicit the input and feedback from the detainees/inmates population regarding meals.

Taste tests of the meals reveal food is seasoned, and served at the appropriate temperature. Three meals are served daily; at least two of the meals are hot. Food service is not providing medical diets. Diet orders required but not being provided include the type of diet prescribed, duration of the diet and any special instructions. There was no religious diet menu available for those whose dietary requirements cannot be met via the common fare menu.

The facility uses the same two-week cycle menu for regular trays and religious and or medical trays. A nutritional analysis is on file for the two-week cycle menu but current credentials for the dietician could not be found. There are no diet menus developed to follow medical diet requirements. Therefore, medical diet trays are not consistent and have no nutritional analysis on file for items served to the detainees/inmates on a medical diet requirement.

Religious diets are not being adhered to as there is no Religious Diet menu to follow to meet the religious dietary laws. Additionally, as there is no religious diet menu to follow nor a nutritional analysis on file for items served to the detainees/inmates on a religious diet.

Observation reveal Food Service staff do most of the preparation of the meals and serve the detainee/inmate population. Detainee/inmate food service workers are mainly utilized for sanitation duties and assist in the preparation of trays served to the detainee population. Detainees/inmates are observed to be under proper supervision at all times. Correctional officers pick up meals and are responsible for handing out meals to the detainees/inmates in a timely and orderly fashion in each



housing unit. Appropriate hair and beard restraints and disposable gloves are not used to handle food trays during satellite feeding.

**E - Restrictive Housing**                                    **Unsatisfactory ("At-Risk")**

A review of CCCC's RHU management is based on staff, detainee/inmate interviews, review of policy and procedures, and direct observation. The results reveal CCCC has not updated policies and procedures to reflect the United States Department of Justice restrictive housing requirements. There are no specific procedures for the operation and management of the CCCC's RHU.

CCCC's policy on detainees'/inmates' records does not describe or contain procedures for maintaining detainee/inmate RHU file upon release from RHU. Jail-1 has four RHU's on the 10th floor for male detainees/inmates, and Jail-2 have one RHU on the 2nd floor for female detainees/inmates with a Control Pod. The Control Pod manages staff and detainee/inmate access into the unit.

Review of detainees'/inmates' records reveal the frequency and cumulative length of placement in Administrative Segregation or Disciplinary Isolation (RHU) is not documented. Interview with Intake staff reveal detainees/inmates are release from RHU to the community. Review of human resource file for employees assigned to RHU reveal employees assigned to RHU are not evaluated on compliance with RHU policies and procedures as required by FPBDS.  The facility does not provide correctional implications of young adult (age (18-24) brain development and associated de-escalation tactics training for assigned RHU staff.

CCCC medical staff conduct a pre-admission to restrictive housing medical evaluation prior to detainees'/inmates' placement in RHU. Detainees/inmates with serious mental illness are housed on the 7th floor mental health pods and dormitory. An interview with mental health staff reveal stable detainees/inmates with mental health issues are place in RHU for rule violations. However, when a detainee/inmate with mental health issues becomes disruptive, mental health staff report to RHU to assess the detainee/inmate and determine the appropriate course of action.

There is no documentation confirming mental health staff visit RHU and conduct face-to-face clinical contact with mental health detainees/inmates as required by FPBDS. The facility has not developed enhanced opportunities for in-cell and out- of- cell therapeutic activities and additional unstructured out-of-cell time for detainees/inmates with mental health issues in RHU.

Review of the list of infractions subject to disciplinary isolation, reveal not all infractions listed meet the standard (i.e. refusing a direct order from staff, refusing to work, stealing or possession of stolen property). Additionally, upon completion of a rule violation investigation for Major or Serious Rule Violations, the designated facility Investigator forwards the disciplinary packet to the Warden for review. The Warden, upon review of the disciplinary packet imposes up to 30 days in disciplinary isolation without a disciplinary hearing; violating detainees/inmates 5th and 14th Amendment Rights under the United States Constitution as they relate to Due-Process.

Disciplinary Board Hearings are initiated when a detainee/inmate commit a rule violation which will likely result in disciplinary isolation over 30 days.  Moreover, detainees/inmates may appeal disciplinary actions to the Warden who imposed the sanction. Because the Warden is the imposing and appeal authority, detainees/inmates have no access to an impartial disciplinary hearing process. Review of several completed detainees'/inmates' disciplinary records and interview with the chair person on the Disciplinary Board, confirms rules violation resulting from the same incident are served consecutively and not concurrently as required by FPBDS.

During the Facility Review two juveniles were found to be housed in the adult RHU for rule violation; the juveniles were not separated by sight and sound from adult detainees/inmates as required by facility policy.
The co-locating of juvenile detainees with adult offenders in the RHU is a direct violation of FPBDS for juvenile detainees/inmates.  The juvenile detainee/inmates are not sight and sound separated, are not receiving enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

A review of detainees'/inmates' disciplinary isolation status reveal rule violations committed by detainees/inmates do not meet requirements of the FPBDS for disciplinary isolation. CCCC Inmate Discipline policy and procedures and detainee/inmate handbook's description of CCCCs rules and sanctions subject to disciplinary isolation are not in compliance with the FPBDS. Specifically, the FPBDS indicate rule violations approved for disciplinary isolation should involve violence, escape or a threat to institution safety.

Detainees/inmates were issued rule violation reports and appeared before the Disciplinary Board for possession of narcotics and given sixty days in disciplinary isolation. However, interview with chairperson and a review of the disciplinary records reveal the unknown substance was sent to the Sherriff Office for testing and the results have not been confirmed. In another case, a Correctional Officer failed to secure the entrance door of the pod and a detainee/inmate ran out of the pod. The detainee/inmate was charged and received a rule violation for escape and disciplinary isolation without any evidence of an escape plan. Additionally, a detainee/inmate received a rule violation of escape and attempted escape for possession of a cell phone and there was no evidence of an escape plan. The detainee was sanctioned to disciplinary isolation by the Disciplinary Board.

Review of Health Services policy and procedures confirm medical staff are required to visit detainees/inmates in RHU for two or more days three times a week; however, detainee/inmates in RHU receive no daily visit from medical staff. Observation of medical entering the RHU reveal medical staff enter RHU for medication distribution and did not announced their presence. Interview with management staff and observation of the multidisciplinary committee's weekly meeting reveal medical and mental health staff do not attend the meeting. Those in attendance include the Warden, Investigators, and other Correctional Supervisors. The facility has not developed a program for returning detainee/inmates to less restrictive conditions as promptly as possible, nor implemented a step-down program for detainees/inmates in RHU for preventative purposes to less restrictive housing.



CCCC detainees/inmates on disciplinary isolation status and administrative segregation pending investigation are given oatmeal, a piece of bread, and milk for breakfast and a bologna sandwich, a piece of fruit and milk for lunch. Detainees/inmates interviewed complained the bologna is rotten and the food trays smell. However, detainee/inmates in general population are provided a different meal. There are no policy and procedures regarding serving detainees/inmates alternative meal that meet basic nutritional requirements when detainee/inmates use food or food tray in a manner to harm staff. Interviews with RHU staff reveal meal restriction is imposed upon inmates by the Warden as punishment.  Additionally, detainees/inmates are not provided with cleaning solution or equipment to clean their cells the same as detainees/inmates in general population.

Many RHU were cells were cold, and despite numerous request by detainees/inmates for a second blanket, the request was denied.  When asked for CCCCs policy and or procedures regarding issuance of as second blanket, especially during winter; RHU SRT supervisory staff responded, "There is no policy, it's up to us if they get a second blanket or not".  Continued interview with RHU SRT supervisor and custody staff reveal SRT members use prejudice and unofficial authority to dictate and control detainees/inmates behavior while housed in the RHU, this includes the withholding or denial of personal hygiene items, and deliberate indifference to humane needs such as blankets when it's cold.

Review of RHU watch log and direct observation confirm Correctional Officers observe each detainee/inmate in RHU every 10-minutes on an irregular schedule.  However, Correctional Officers indicated the 10-minute observation of each detainee/inmate was implemented by the Warden due to the recent suicides at the facility. There are no policy and procedures requiring all detainees/inmates in RHU are personally observed every 10-minutes.  However, a memorandum dated October 17, 2018 was posted on the bulletin board in the Special Response Team (SRT) office regarding the revised procedures when conducting security rounds on all detainees/inmates in RHU.

Review of RHU log books reveal the Warden, Assistant Wardens, Shift Sergeant do not visit RHU's as required by FPBDS. Interviews with detainees/inmates in RHU and observation of the SRT officers who work in RHU reveal considerable tension between the two.  SRT officers are dressed in black tactical uniforms and wear stab resistance vests and the focus of their training is tactical deployment. Detainees/inmates are intimidated, and express having difficulty obtaining basic personal needs such as toothpaste, and toilet paper from SRT officers. According to a detainee/inmate, a SRT member told him toilet paper is given out on Wednesdays and the detainee/inmate was given some paper towels to use. Additionally, detainees/inmates advised reviewers SRT officers use excessive force during cell extractions.

The CCCC's staff training curriculum does not consist of RHU policy review and identifying and reporting signs of detainee/inmate mental health decomposition in RHU. Review of Privileges and Rights of Inmates in Disciplinary Isolation form reveal several detainees/inmates did not receive this form and were unaware of their release date from isolation. Moreover, staff do not post the detainees/inmates form on their door as required by CCCC policy.

Just as detainees/inmates in RHU indicate their cells are extremely cold and request a second blanket from the SRT Officers; Detainee/inmates assigned to "No Contact Housing" (Special confinement



restrictions ordered by the court which include no access to mail, telephones, or general population) make the request to SRT Officers and they too are refused a second blanket. Detainees/inmates in both the RHU and No Contact Housing are not afforded the opportunity to shave and there is no policy or procedures to document when a detainee/inmate is deprived of any authorized item or activity.

Detainee/inmates assigned to "No Contact Housing" are denied general housing privileges to which they are entitled, as they are not confined for disciplinary reasons. Detainee/inmates assigned to "No Contact Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are subjected to the same "Red Zone" lockdown system as RHU detainee/inmates. Additionally, interviews with detainees/inmates in the "No Contact Housing" who are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering.

Detainees/inmates in the RHU reported using articles of clothing and towels or rags for toilet paper, when they are not issued or denied toilet paper by SRT staff.

Detainees/inmates in disciplinary isolation status can write letters to family and friends however, they cannot receive letters as detainees/inmates in the general population, nor can they have social visitation, access to reading materials, telephone and recreation. These privileges are suspended by the Warden. The multidisciplinary committee has not identified programs, in addition to the minimum period of recreation, to increase out-of-cell opportunities for recreation, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees/inmates as required by FPBDS.

Detainees/inmates on disciplinary isolation status do not have access to education services, basic commissary services and library services. Additionally, the facility does not have an Imam for Muslim detainees/inmates.

CCCC has not developed a data base which includes the following: race, national origin, religion, gender identity, sexual orientation, disability, and age as required by FPBDS. CCCC's policy and procedures identify the most common reasons detainees/inmates request protective housing (e.g. with prior cooperation with law enforcement, a conviction for a sex offense, gang affiliation, and sex or gender identification) and identify procedures for safely housing these detainees/inmates outside of RHU.

**F - Safety and Sanitation**                                                    **Unsatisfactory**

The Safety and Sanitation review consists of staff and detainee/inmate interviews, review of the facility's policies and procedures and direct observation of the daily operations. The facility does not conform to all applicable federal, state, and local fire safety codes; to those set forth by the National Fire Protection Association (NFPA); and the Occupational Safety and Health Administration (OSHA).

The facility is not fully covered with an automatic sprinkler system. Jail I has the deluge wet sprinkler system which is manually operated by the pod officer while Jail II has an automatic sprinkler system. There is no visual and audible signaling devices in the detainees'/inmates' housing pods. Fire detection and alarm system is tested quarterly.



Standpipe and hose systems, fire extinguishers and self-contained breathing apparatuses is available at appropriate locations throughout the facility; however, monthly inspections documentation is not available. Additionally, training and medical clearance documentations for staff to use self-contained breathing apparatuses is not available.

Daily pods sanitation/physical security inspections are conducted by the pod officer/supervisor using the monthly facility inspection form; however, the Safety Sergeant does not conduct monthly comprehensive safety and sanitation inspections.

An annual fire inspection was conducted by the Cleveland, Ohio Fire Department on October 26, 2018, however there is no documentation available. The Fire Response/Evacuation plan has not been approved by an independent outside inspector. Additionally, the plan does not identify the location of the facility building/room floor plans, the use of exit signs and directional arrows for flow of traffic and location of publicly posted plan.

Fire evacuation plan diagrams are not posted in ample locations for staff, detainees/inmates, and visitors to find the information they need in the event of an emergency. Two exit signs are damaged and unserviceable.

There is no fire rating documentation for detainees' mattresses, shower curtains and trash receptacles in the housing pods to ensure they are fire-resistant, non-toxic, and non-hazardous. There is no documentation available for the current inspection and testing of the Food Service department's fire detection and suppression hood system.

Fire drills are not conducted every three months on each shift as required by the facility's Fire Safety Plan. Drills are not being documented and evaluated. Staff confirm fire drill are simulated training drills. Direct observation of a fire/man down evacuation exercise conducted in the Restrictive Housing Pod (cell A24/25/26) reveal the need for staff to practice more live evacuation drills. RHU detainees/inmates were released from their cells without restraints at one time. Responding staff did not bring emergency keys and fire extinguishers and there is no emergency visual and audible signaling devices in the detainees/inmates housing pods. The first responding staff; the Safety Manager, a unit officer and nurse, arrived within a minute. The nurse did not carry any emergency equipment and failed to immediately assess the victim while the Safety Manager proceeded to assess and start CPR.

No direction or assistance was provided to the staff performing CPR. The nurse did not exhibit a sense of urgency when calling for back up and emergency equipment. The victim was moved out of the cell within four minutes of the man-down call. On the suspicion of an overdose, the Safety Manager responded by administering nasal Narcan he carried in his belt pouch. Nurses do not carry Narcan. Within five minutes from the start of the man-down drill, three additional nurses responded with a gurney, AED, oxygen and emergency bag. One of the nurses took the lead, assessed the victim and gave direction to stabilize victim and place on the gurney for transport. All responding staff had primary personal protection equipment (PPE – gloves). The medical staff demonstrated competency with the use of the emergency equipment. Many of the responding staff appeared to lack a sense of urgency appropriate to the exercise.



Direct observation reveal inappropriate storage, use and accountability of flammable, toxic, and caustic materials in accordance with OSHA regulations in the following areas; in the Food Service department, Maintenance department, sanitation chemicals storage area, housing pods and roving barber's carts. Several unlabeled bottles with chemicals inside, were found throughout the facility. Also, there is no written documentation of safety training for detainees handling chemicals.

The facility's housekeeping plan/sanitation policy and procedures for cleaning and maintaining the facility is not being enforced. Sanitation levels throughout the facility including the housing pods and cells are poor. Multiple housing pods contained no cleaning chemicals for detainees/inmates to clean their cells. Detainees'/inmates' clothing storage areas are cluttered and unsanitary. In several pods, detainees/inmates are using cardboard boxes as trash receptacles and/or property storage containers.

On the 5th floor of the facility is an area referred to as the "Bull Pen" which at one time was a housing unit with double and single occupancy cells. At some point, the housing unit was repurposed to holding cells for inmates being held for appearance in county court. On the first day of the Facility Review, a facility staff member suggested to this reviewer to visit the "Bull Pen" area. While touring the area, several inmates in one holding cell standing or seating on the floor because there are no benches or other suitable seating for up to eleven inmates per cell who remain in these conditions for approximately 8 to 10 hours. Some inmates were observed eating with no area to place food items other than on the floor.  Numerous inmates complained they were thirsty or needed to use the restroom. Observation revealed toilets/washbasins were unserviceable due to the water being turned off by staff.

Two showers located in the male booking area are dirty and unserviceable.

Detainees/inmates in other pods have access to toilets and washbasins with temperature controlled hot and cold running water 24-hours a day. Additionally, detainees/inmates can use toilets without staff assistance when confined to their cells and housing pods. Access to operable and clean showers with temperature controlled hot and cold water is available.

The City of Cleveland, Department of Public Health conducted an annual health inspection on August 17, 2018 with three deficiencies in the Food Service department which were corrected during the inspection. Vermin and pests are controlled through inspections and treatments by Orkin Pest Control Company. However, in 10C housing pod showers, there are flying bugs on the ceiling and walls. During the review, mice were seen in the food service dry storage warehouse.

The facility's water supply is regulated by the Cuyahoga County Department of Public Works. However, the facility's potable water source and supply is not certified annually by an independent outside source.

A ventilation system survey was conducted by Johnson Controls Company however there is no date when the survey was conducted nor signature of the person conducting the survey. Noise levels measurements in detainees'/inmates' housing pods are being documented. Lighting throughout the

facility meets FPBDS. Lighting levels in detainees'/inmates' cells are at least 20 ft. candles in grooming and writing areas.

The number of detainees/inmates exceed the facility's rated bed capacity. The rated bed capacity is 1,765 detainees/inmates however during the Facility Review the detainees/inmates count was 2,420. In several housing pods detainees/inmates sleep with mattresses on the floor. In several housing pods detainees/inmates are not provided a place to store their clothes and personal belongings.

Detainees/inmates have access to hygiene items through the commissary. Indigent detainees/inmates may receive necessity items from the pod officer weekly without cost.

Observation of the admission process confirm detainees/inmates are issued one set of clothing. All detainees/inmates booked into the facility and have their own personal underclothing and socks will be allowed to keep them. Detainees/inmates who are proven to be indigent at the time of their booking and or not possessing underclothing will receive county issued underclothing. If they receive monies at a later date, they are required to purchase underclothing from the commissary and return county issued underclothing to the laundry. Detainees/inmates are issued one mattress in the housing pods. Several housing pods cells have worn and damaged mattresses. Mattresses are not being cleaned monthly or after use according to the facility's sanitation policy.

The detainee/inmate hair care policy and program is not effective. Detainees/inmates are not afforded an opportunity for hair care services on a regularly scheduled basis. Barbering equipment is maintained on two roving barber carts, which are not cleaned and disinfected regularly. There are two unlabeled chemical spray bottles and two unlabeled containers with a dirty/hairy chemical solution for disinfecting the hair combs and clipper guides. Neck strips are not available. An inventory of barbering tools and equipment is not available. The schedule for haircuts is not posted in the housing pods.

Essential lighting and life sustaining functions is maintained inside the facility and can operate in an emergency. Power generators are inspected weekly and load tested quarterly. CCCC is a tobacco-free facility.

**G - Services and Programs**                                                    **Satisfactory**

The review of Services and Programs is based on a review of policies and procedures, direct observation and interviews with staff and detainees/inmates. CCCC has a formal classification process and plan which begins at admissions for managing and separating detainees. The policy states and the Intake Sergeant confirms, the classification process ensures detainees/inmates are housed in the least restrictive setting necessary to ensure the safety of detainees and staff. The classification system identifies the most common reasons detainees/inmates request protective housing.

Detainee/inmate housing assignments are determined by gender, age, legal status, custody level and special needs. Jail I and II detainees/inmates housing plan consists of the following designations: ages



45+, 40+, 30 +, and 26+; gang affiliation; vulnerable; special needs; step down; veterans; diabetic; Cleveland City; juveniles; and females.

Detainees have access to courts, legal counsel and legal materials however according to staff, detainees/inmates must go through another agency, the Department of Social Services to obtain an unmonitored telephone call with his/her attorney. Attorney/client visiting rooms are available. Detainees may request access to computers with Lexus Nexus software for legal material.

Detainees can send and receive uncensored correspondence from federal, state, and county courts, executive and legislative branch officials of the United States, county and state officials and officers, attorneys and the media. Legal mail to and from attorneys must be properly marked as legal.

The detainee handbook and direct observation confirms detainees' outgoing mail is sealed and not inspected. Indigent detainees/inmates may receive two envelops and writing paper weekly. Detainees/inmates in RHUs disciplinary isolation status can send letters to family and friends however, they cannot receive letters, nor can they have social visitation, access to reading materials, telephone and recreation. The detainee handbook provides a list of authorized and unauthorized items detainees/inmates may be received in packages.

CCCC policy and direct observation verifies general population detainees/inmates have access to smart touch telephones in their pod dayrooms. A Telecommunications Device for the Deaf (TDD) telephone is available in the Sergeant's office on the 4th floor for detainees who are hearing impaired. Security staff are required to check detainee telephones to ensure they are operable and request repairs as needed.

There are three full-time and one part time Chaplains for CCCC facilities. The Administrative Chaplain is responsible for coordinating religious programs for the detainee/inmate population. The Chaplains' endorsements by their appropriate religious certifying bodies were not available for review as requested. Chaplains have physical access to all areas of the facility and rotate weekly to visit detainees in their housing pods. Muslim detainees/inmates complained about not having access to an Imam. According to the Administrative Chaplain, he has made several attempts to recruit an Imam to come into the facilities on a regular basis however he has not documented his attempts. Various other faith group volunteers provide programs and services weekly.

Leisure activities and outside physical activity programs are not consistently provided as stated in the CCCC's policy due primarily to the implementation of the previously described "Red Zone" system.

Visitation is available for detainees/inmates to maintain community and family ties. Social visits are non-contact and limited to two fifteen-minute visits per week. Visitors are required to make an appointment to visit detainees/inmates based upon their housing unit's assigned visiting days. Special visits may be requested for visitors traveling from out of town.

A review of the facility's work program policy and staff interviews reveal USMS detainees are not allowed to participate in the facilities' volunteer work program. Institutional inmate positions include: Food Service Workers, Laundry Room Workers, and General Maintenance Workers; detainees/inmates workers are not compensated for the work they perform.



The Grievance Program is managed by the Sergeant who is also responsible for handling detainee/inmate hearings, staff rosters and other operational duties. The facility policy addressing the grievance process totally contradicts information provided in the detainee/inmate handbook.

The handbook instructs detainees/inmates to initiate grievances, other than those medical related, by writing to the Cuyahoga County Sheriff (at his business street address), while the CCCC policy indicates informal and formal grievance options. The facility provides detainees/inmates with two-ply carbonless request forms or Kites which can also be used to file grievances however, detainees/inmates are required to draw in a box and check it for non-medical grievance issues.

Detainees/inmates are not allowed to retain a copy of the form. They must submit both copies to ensure a response is received. A request to review the grievance logs for the past six months was unfulfilled due to the computer system's inability to print the logs by the month. The Grievance Sergeant receives all grievances, logs them in and forwards them to appropriate staff member for response. According to the reviewer's examination of the grievance log on the computer screen, timelines, basis for grievances and dispositions were vague and difficult to determine. Grievance trends are not tracked.

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

## Detailed Findings by Functional Area

### A - Administration and Management

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|------|------|------|
| A.1 | Policies and Procedures | Unsatisfactory |
| A.2 | Quality Control | Unsatisfactory |
| A.3 | Detainee Records | Unsatisfactory |
| A.4 | Facility Admission and Orientation Program | Marginal |
| A.5 | Detainee Property | Marginal |
| A.6 | Detainee Transfers and Releases | Satisfactory |
| A.7 | Detainees with Disabilities | Satisfactory |
| A.8 | Discrimination Prevention | Marginal |
| A.9 | Staffing | Satisfactory |
| A.10 | Staff Training | Marginal |
| A.11 | Emergency Plans | Marginal |
| A.12 | External Agency Notifications | Unsatisfactory |

## Additional Comments

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## B - Health Care

|       | Standard | Finding Options |
|-------|----------|-----------------|
|       |          | - Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
| B.1 | Health Care Administration | Marginal |
| B.2 | Intake Health Screening | Satisfactory |
| B.3 | Medical, Mental Health, and Dental Appraisals | Marginal |
| B.4 | Access to Health Care | Satisfactory |
| B.5 | Provision of Health Care | Marginal |
| B.6 | Incident Health Care | Marginal |

**<u>Additional Comments</u>**

## C - Security and Control

|       | Standard | Finding Options |
|-------|----------|-----------------|
|       |          | - Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
| C.1 | Correctional Supervision | Unsatisfactory |
| C.2 | Detainee Accountability | Satisfactory |
| C.3 | Control of Contraband | Satisfactory |
| C.4 | Use of Force/Non-Routine Application of Restraints | Marginal |
| C.5 | Weapons Control | Satisfactory |
| C.6 | Keys, Tools, and Medical Equipment Control | Unsatisfactory |
| C.7 | Post Orders | Unsatisfactory |
| C.8 | Detainee Discipline | Marginal |
| C.9 | Restrictive Housing | Unsatisfactory |
| C.10 | Detainee Transportation | Satisfactory |

**<u>Additional Comments</u>**



**D - Food Service**

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| D.1 | Food Service Administration | Satisfactory |
| D.2 | Food Service Employee/Worker Health | Marginal |
| D.3 | Food Storage and Preparation | Unsatisfactory |
| D.4 | Equipment, Utensils, and Linens | Unsatisfactory |
| D.5 | Detainee Meals and Special Diets | Unsatisfactory |

**Additional Comments**

**E - Restrictive Housing**

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| E.1 | Detainee Records | Unsatisfactory |
| E.2 | Detainee Transfers and Releases | Unsatisfactory |
| E.3 | Staffing | Unsatisfactory |
| E.4 | Staff Training | Unsatisfactory |
| E.5 | Incident Health Care | Unsatisfactory |
| E.6 | Detainee Discipline | Unsatisfactory |
| E.7 | Administrative/Disciplinary Segregation | Unsatisfactory |
| E.8 | Classification and Housing | Satisfactory |

**Additional Comments**

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**F - Safety and Sanitation**

|         | Standard                             | Finding Options                                                                |
|---------|--------------------------------------|--------------------------------------------------------------------------------|
|         |                                      | - Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
| F.1     | Fire Safety and Chemical Control     | Unsatisfactory                                                                 |
| F.2     | Sanitation and Environmental Control | Unsatisfactory                                                                 |
| F.3     | Clothing and Bedding                 | Satisfactory                                                                   |
| F.4     | Detainee Hygiene                     | Satisfactory                                                                   |
| F.5     | Emergency Power and Communications   | Satisfactory                                                                   |

**Additional Comments**

**G - Services and Programs**

|         | Standard                               | Finding Options                                                                |
|---------|----------------------------------------|--------------------------------------------------------------------------------|
|         |                                        | - Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
| G.1     | Classification and Housing             | Satisfactory                                                                   |
| G.2     | Access to the Courts and Legal Materials | Satisfactory                                                                 |
| G.3     | Mail                                   | Satisfactory                                                                   |
| G.4     | Telephones                             | Satisfactory                                                                   |
| G.5     | Religious Programs                     | Satisfactory                                                                   |
| G.6     | Recreation                             | Unsatisfactory                                                                 |
| G.7     | Visitation                             | Satisfactory                                                                   |
| G.8     | Work Programs                          | Satisfactory                                                                   |
| G.9     | Grievance Program                      | Unsatisfactory                                                                 |

**Additional Comments**



**CUYAHOGA COUNTY**
**AGENCY OF INSPECTOR GENERAL**

<u>**REPORT OF INVESTIGATION**</u>

| | |
|---|---|
| **CASE NUMBER:** | 18-0050-I |
| **SUBJECT(S) INFO:** | Kenneth Mills, Former Regional Director of Corrections |
| **COUNTY DEPARTMENT:** | Cuyahoga County Sheriff's Department |
| **SOURCE OF REFERRAL:** | Cuyahoga County Human Resources Department |
| **METHOD OF REFERRAL:** | Email |
| **INITIATED:** | September 24, 2018 |
| **DATE OF REPORT:** | December 31, 2018 (amended January 8, 2019) |

## I. Summary

The Cuyahoga County ("County") Agency of Inspector General ("AIG") received notice that Regional Director of Corrections Kenneth Mills was potentially engaging in discriminatory comments and behavior in the workplace. Following requests from the Law Department and Human Resources, the AIG investigated the allegations. Consistent with its requirement to avoid interfering with investigations by other government entities, the AIG temporarily suspended its proceedings during the pendency of an investigation by the US Marshal's service.

After interviewing eighteen witnesses and reviewing numerous documents, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments regarding Marcus Harris' ("Harris") and Gary Brack's ("Brack") perceived sexual orientation; and was not sufficiently compliant with the County's continuing commitment to diversity.* Despite numerous requests over several weeks that he appear for an interview with the AIG, Mills has not done so.

The AIG investigation confirmed three witnesses who reported first-hand knowledge of Mills' discriminatory comments. Further, other County employees reported as to widespread commentary in the workplace regarding similar comments allegedly made by Mills. These secondary reports are given little or no weight as to Mills' personal conduct. Nonetheless, the reports by secondary sources are reported because they were widely-disseminated and reflect – at minimum – the need for the County to re-double its current efforts to support a Culture of Respect. It is also indicative of the need to protect whistleblowers from the fears of retaliation for reporting such conduct. The AIG did not find sufficient direct evidence to support claims that Mills made anti-semitic comments.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action specific to Mills. The AIG, however, recommends that the County expand its training and educational efforts that will reinforce the County's commitment to supporting a Culture of Respect.

Cuyahoga County Agency of Inspector General
2079 East Ninth Street 19th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

Electronically Filed 2079 East Ninth Street 19th Floor • Confirmation Nbr. 1844226 • CLSLP


EXHIBIT
B

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 2 of 14

# II. Background

## A. Cuyahoga County Sheriff's Department

According to its website the mission of the Sheriff's Department is as follows:

> Our mission as caretaker of the public's safety is dedicated to maintaining the trust and respect of those we serve by resolutely and aggressively enforcing the law and by committing ourselves to the efficient and effective delivery of safety services. As agents of the community, we strive to provide appropriate custodial care along with programs that support the physical, spiritual and constitutional needs of individuals committed to our custody. Further, every effort will be made to assist the inmates in our custody to understand and take responsibility for their involvement in the justice system.

The Department has several divisions – Civil, Law Enforcement and Corrections. The County Sheriff is Clifford Pinkney.

## B. Cuyahoga County Sheriff's Department – Corrections Division

According to the Corrections webpage, the County Corrections Center ("CCC") is the second largest Jail in the state and is a full-service Jail serving over 26,000 inmates annually.

During the course of the investigation, AIG staff learned that there are currently three locations, Downtown, Euclid, and Bedford. The Downtown Jail, which is the primary facility, consists of two high rise buildings housing all levels of security statuses, from maximum security to weekenders.

The CCC operates a full-service Kitchen, Medical Clinic and Pharmacy and provides Social Service programing, all managed by a staff of over 700 employees. CCC partners with MetroHealth for medical care.

The CCC is managed by a Regional Director of Corrections, a Warden, three Associate Wardens, Facility Services Manager, Mental Health Services Manager, and Health Care Services Director. The daily operations are managed by sergeants who oversee Corporals and a complement of approximately 550 Corrections Officers.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 3 of 14

## C.  Kenneth Mills

Kenneth Mills ("Mills") was employed by the County for four years. Mills began working at the County in 2014 as Director of Public Safety and Justice. In 2015, he transitioned to Regional Director of Corrections where he served until his resignation on November 15, 2018.

Mills resigned before AIG staff had an opportunity to interview him. Subsequently, AIG staff attempted to contact Mills and his legal counsel multiple times – by telephone, regular mail, and certified mail. In response, Mills left a voicemail indicating that he needed to consult with legal counsel as to whether he would be willing to speak with the AIG. After his voicemail, communications were directed only to Mills' legal counsel. However, despite multiple efforts, the AIG was not able to interview Mills.

| DATE | CONTACT TYPE | NUMBER/EMAIL/ ADDRESS | NOTES |
|------|--------------|----------------------|-------|
| November 19, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Regular USPS to Mills' address in personnel file. | | |
| November 27, 2018 | Certified USPS to Mills' address in personnel file. | | Return receipt received by AIG December 11, 2018. |
| December 12, 2018 | Telephone – Voicemail from Mills. | | Mills left a voicemail message for IG stating he needed to discuss AIG request with attorney. |
| December 13, 2018 | Telephone to Mills' cell phone number. | | AIG obtained Mills' cell phone number and called to request contact information for attorney. |
| December 13, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. | | AIG staff left a message with Attorney Spellacy's assistant. |
| December 13, 2018 | Email to Mills' attorney Kevin Spellacy – requesting interview with Mills no later than December 21, 2018. | | |
| December 13, 2018 | Certified USPS to Mills' attorney Kevin Spellacy at his office - requesting | | Return receipt received by AIG December 19 or 20, 2018. |

Electronically Filed 2019 Feb 19 10:07 PM Confirmation Nbr. 1787785 / CLSLP

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 4 of 14

| | interview with Mills no later than December 21, 2018. | | |
|---|---|---|---|
| December 14, 2018 | Telephone – Voicemail from Mills' attorney Kevin Spellacy. | | Spellacy left a voicemail for AIG staff returning AIG call. |
| December 18, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. | | AIG staff left a message with Spellacy's assistant. |

As of the date of this report, the AIG has received no affirmative or negative response from Mills or his attorney regarding its request for an interview with Mills. Accordingly, there is no interview of Mills in this report.

### D. Investigation

#### 1. Written and Electronic Documents Reviewed by AIG in the Course of this Investigation

- Letter from Gary Brack's Attorney, Subodh Chandra
- Kenneth Mills Emails from 1/1/18 - 9/20/18
- Kenneth Mills Emails from 1/1/17-12/31/17
- Kenneth Mills HR Personnel File, Job Description, Disciplinary File
- Cuyahoga County Ethics Code
- Cuyahoga County Employee Handbook

#### 2. Interview of Gary Brack – May 30, 2018

Prior to this interview, Brack was the interim Nursing Director at the County Jail. Brack was employed by MetroHealth but worked with the three County jails: the downtown jail location, the Euclid jail location, and the Bedford Heights location. Brack started working with County jails in September of 2016, as a Nursing Supervisor. He also took on administrative duties such as scheduling and grievances. When Nursing Director, Harris, resigned from his position, Brack became the interim Nursing Director until MetroHealth pulled him from working at the County jail.

During an interview with AIG staff, Brack indicated that he had received reports of discriminatory comments and behavior by Mills. In April 2018, Brack was told by Employee-1 ("Employee-1") that Mills asked Employee-1 "if Gary [Brack] and Marcus [Harris] were fucking". According to Employee-1, Mills then said, "I hate fucking faggots" when she asked why he cared. When asked about any other discriminatory behavior on the part of Mills, Brack also mentioned that when discussing a budgeting concern, Mills purportedly made anti-semitic comments to Employee-1 regarding County Executive Armond Budish ("Executive Budish").

### 3. Interview of Employee-1 – October 1, 2018 and November 16, 2018

Employee-1 ("Employee-1") has been employed by the County Sheriff's Department ("Sheriff's Department") in the Fiscal Office ("Fiscal") for ten (10) years. Employee-1 has six direct reports and reports directly to senior leaders in the Sheriff's Department.

During the interview, AIG staff asked Employee-1 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-1 gave the following examples:

1. Employee-1 stated that in 2017 when she and Mills were discussing Harris' mileage reimbursement request (that Mills did not want to sign), Mills asked her "You do know they're lovers? They are faggots". Employee-1 stated that Mills may have said "fucking faggots", but was not certain;

2. Employee-1 stated that in 2017 when she and Mills were discussing requesting more money for cameras in the jail, Mills told her the "You know the Executive is not going to give you any more money, he's a Jew";

3. Employee-1 stated that in 2017 Mills told Employee-1 that an African-American sergeant is an inadequate employee. Employee-1 then asked how she got her job, and Mills pointed to his arm as though he meant skin color;

4. In 2017 Employee-6 told Employee-1 that one of nurses intended to file a sexual harassment complaint against Mills; and

5. Employee-1 stated Mills told her the Sheriff thinks he is untouchable because he is the first African-American Sheriff.

Employee-1 noted that Mills always made these comments when there were no other witnesses.

When asked if she ever made a formal report regarding Mills' comments, Employee-1 stated she was reluctant to report due to a fear of retaliation and when Brack was terminated her fears were confirmed.

### 4. Interview of Employee-2 – October 23, 2018

Employee-2 ("Employee-2") is a senior manager in the County Office of Budget and Management ("OBM"). Employee-2 also advises the County Executive and County Council on budget-related matters.

According to Employee-2, no one from the Sheriff's Department reports directly to OBM, but Employee-2 and her team work with Employee-1. OBM, however, does make budget restriction recommendations.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 6 of 14

Employee-2 stated that she believes there was a personality conflict between Mills and Employee-1.

During the interview, AIG staff asked Employee-2 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-2 gave the following examples:

1. Mills told Employee-2 that Employee-4 and Sheriff Pinkney were stupid, lazy, and did not want to manage the jail;

2. Mills told Employee-2 that Sheriff Pinkney was only appointed because he is black;

3. Mills made an anti-homosexual comment in Employee-2's office. Employee-2 does not remember exactly what he said but she stated her belief that Mills' comments indicated that he "does not like homosexuals"; and

4. Mills stated that he thought Harris and Brack were dating.

Employee-2 noted that these comments were not made in the presence of other witnesses.

## 5. Interview of Sheriff Clifford Pinkney – October 4, 2018

Sheriff Pinkney has been employed with the County Sheriff's Department since 1991. Sheriff Pinkney has held the following positions: deputy sheriff, deputy sergeant, lieutenant, Chief Deputy Sheriff, and in 2015 became the Sheriff. As County Sheriff, Pinkney's job duties include overseeing the Sheriff's Department office operations, as well as developing and maintaining partnerships with stakeholders, in the community, and with other law enforcement entities. Sheriff Pinkney reports to Executive Budish. Sheriff Pinkney's direct reports include Employee-4, Special Assistant to the Sheriff, Director of Regional Corrections, Business Services Manager, Medical Director, and other Sheriff personnel as necessary.

During the interview, AIG staff asked Sheriff Pinkney if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Sheriff Pinkney gave the following examples of complaints he had received:

1. Employee-1 told Sheriff Pinkney that Mills made comments about Brack and Harris' sexuality;

2. Employee-1 told Sheriff Pinkney that Mills made comments about working for African Americans – something to the effect of "they are lazy" and he would not enjoy working for two African Americans if George Taylor took the Chief job;

3. Employee-1 told Sheriff Pinkney that Mills made a derogatory comment about Executive Budish being Jewish and therefore cheap;

4. There was a rumor that Mills did not like women or African Americans;

5. Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women. In fact, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist"; and

6. Employee-6 told Sheriff Pinkney the nurses complained about Mills' behavior but were afraid to come forward due to the possibility of retaliation from Mills.

The Sheriff stated he did not take action on Employee-1's statements because he had no proof other than Employee-1's allegations and he knew Employee-1 and Mills had a strained relationship. Furthermore, he did not take action on the other information because they were informal "gripes" and he had no evidence or specific information.

### 6. Interview with Employee-3 – October 15, 2018

Employee-3 ("Employee-3") was a day shift charge nurse in the main dispensary. Employee-3 recently resigned from the County and is moving to work in a federal prison. At the time of the interview, Employee-3 had worked for the County for almost 15 years. Employee-3's duty as charge nurse was to oversee all staff nurses, be responsible for day-to-day operations in the dispensary, and respond to emergencies.

During the interview, AIG staff asked Employee-3 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-3 gave the following examples:

1. There was discussion among corrections officers ("CO") that Mills sent an email that said, "that fucking faggot" (referring to Harris) "is never going to tell me what to do"; and

2. It was believed in the jail that Mills does not like gay people.

Other pertinent information included:

1. Employee-3 stated that when Mills first came to the County he would always talk to her. The attempted communications were "super friendly" and "odd".

2. Employee-3 stated that in the jail she heard corrections officers refer to Harris as a "woman" or a "faggot." Employee-3 also stated that, after Brack was terminated, many corrections officers said they were glad that the "fag is gone."

3. Employee-3 stated that there was an issue with male inmates receiving bras and panties. Floor supervisors did not want to provide the underclothes and therefore required a medical prescription before providing the underclothes to inmates. The nurses would tell the COs that no prescription was necessary, and the COs would still refuse to provide the requested underclothes to the inmates.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 8 of 14

## 7. Interview of Employee-4 – September 27, 2018

At the time of the interview, Employee-4 had been a senior leader of the Cuyahoga County Sheriff's Department for three (3) years. Employee-4 reports directly to Sheriff Pinkney. Employee-4's direct reports include an employee from both the law enforcement and administrative divisions of the Sheriff's department, the Director of Regional Corrections, and the Medical Director from MetroHealth. As of November 19, 2018, Employee-4 is now the interim Director of Regional Corrections.

During the interview, AIG staff asked Employee-4 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-4 gave the following examples:

1. Someone (he does not remember who) told Employee-4 that Mills made a comment about Brack and Harris dating.

2. Someone (he does not remember who) told Employee-4 that there are female employees and female Judges who did not like to interact with Mills.

3. Someone (he does not remember who) commented to Employee-4 that Mills made an anti-Semitic comment about Executive Budish - something to the effect that Executive Budish is a Jew and does not want to give money to Mills' budget.

Employee-4 noted that Mills and Employee-1 did not get along well together.

## 8. Interview of Employee-5– October 1, 2018

Employee-5 ("Employee-5") is a senior leader in the County Sheriff's Department. Employee-5 started in this role in September 2018. Employee-5 reports to Warden Eric Ivey ("Ivey"), who reports to Director of Regional Corrections Ken Mills ("Mills"), who reports to Chief George Taylor who reports to Sheriff Clifford Pinkney ("Sheriff Pinkney"). Within his chain of command, Employee-5 supervises a total of sixty (60) COs, a corporal, and a sergeant—who reports directly to Employee-5. Employee-5's job duties include booking and release.

During the interview, AIG staff asked Employee-5 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-5 gave the following example: There was a claim that Mills said one of the County employees makes too much money for a woman.

## 9. Interview of Employee-6 – October 3, 2018

Unlike other witnesses identified in this report, Employee-6 is an employee of MetroHealth Hospital System, not an employee of the County. Employee-6 works in the County jail as the Ambulatory Director, and she has been in this position for 4 ½ years. Her duties include budgeting and operations within the CCC medical facility. Her direct reports are nurse

Electronically Filed 06/21/2021 16:19 / / CV 20 935929 / Confirmation Nbr. 2256745 / CLSLP

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 9 of 14

practitioners and paramedics, and she reports to Julia Brunner (Director of Ambulatory) at
MetroHealth.

During the interview, AIG staff asked Employee-6 if she knew of incidents of Mills making
derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior.
Employee-6 gave the following examples:

1. There was a rumor that Mills said Harris and Brack are gay and are dating; and

2. Employee-1 told Employee-6 that Mills said Employee-6 made too much money for a
   woman.

### 10. Interview of Employee-7 – October 4, 2018

Employee-7 has been with the county for five years. Her current position is Business
Administrator in the Fiscal Department. She has been in her current position since February
2017, and was in Justice Services previously for one year. She is currently 2nd in command in
the Fiscal Department, and her duties are to discover and manage grants whether they are
federal grants, state grants and any other grants that may be available for the jails. She also
manages revenue tracking, statistic request, manages the analysis, staffing numbers, etc., and
ad hoc reports. Her direct reports are Lylia Latham, Judy Fulkerson, and there is a current
vacancy. Employee-7 reports to Employee-1, Employee-1 reports to Taylor and Taylor reports
to the Sheriff.

During the interview, AIG staff asked Employee-7 if she knew of incidents of Mills making
derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior.
Employee-7 gave the following examples:

1. Employee-7 heard Mills made a comment about the Sheriff that made her uncomfortable
   enough to abruptly leave a meeting.  Employee-7 believes the comment was something
   to the effect of the Sheriff is too tight to give up money for new cameras and could find
   the money if he wanted to," the miser"; and

2. There was a discussion that the former business service manager left the Public Safety
   and Justice Department because Mills was sexist; and

3. Employee-7 heard from Employee-1 that Mills said Harris and Brack were "fags".

### 11. Interview of Dr. Thomas Tallman – October 12, 2018

Dr. Thomas Tallman ("Tallman") is employed by MetroHealth Hospital, and he currently holds
the position as the Medical Director of the jails. Dr. Tallman has held this position for 4 ½ years
and was previously employed as an emergency room physician for the Cleveland Clinic . His
duties as Medical Director are to oversee the correctional health program, including its
scheduled sick call process; oversee the 24/7 intake process; respond to medical emergencies
or acute medical issues as they come up, and handle the overall health of inmates. Dr. Tallman
reports to Dr. Julia Brunner at MetroHealth Hospital. Dr. Julia Brunner is the Director of
Ambulatory Services and Outpatient Services. She also has frequent meetings with Jane

Electronically Filed 06/18/2019 16:33 / / CV 19 915733 / Confirmation Nbr. 1744115 / CLSLP

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 10 of 14

Platten at MetroHealth Hospital. Tallman's direct reports are nurses, the director of nursing, nursing supervisor, pharmacist, x-ray tech, dental, and all healthcare workers assigned to CCC. All nurses report to Tallman even if they are county employees.

During the interview, AIG staff asked Dr. Tallman if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Dr. Tallman gave the following examples:

1. Employee-1 told Dr. Tallman that Mills made comments about two nurses being gay lovers; and

2. Employee-1 told Dr. Tallman that Mills said, "we're never going to get more CO's because the Jew won't spend money." (referring to Executive Budish)

### 12. Interview of Employee-8 – December 4, 2018

Employee-8 is the Charge Nurse for Mental Health and Intake at the County jail. Her responsibilities include supervising Licensed Practical Nurses and Medical Techs. Employee-8 has been a County employee for 13 years. She reports to Nursing Director Aisha Parnell who reports to Dr. Tallman and/ Employee-6.

During the interview, AIG staff asked Employee-8 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-8 gave the following example:

• Employee-8 stated that Mills changed the policy regarding female CO tasks. Employee-8 explained that Mills changed the policy so that female COs could watch male pods and walk male inmates around the jail. Employee-8 stated, even when it was not necessary, Mills would require female COs to watch male pods saying something to the effect of "they took the job so they can do it."

### 13. Interviews of
### Employee-9 – October 3, 2018
### Employee-10 – October 9, 2018

When AIG staff asked the above employees if they knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The above employees stated they had heard rumors of discrimination and/or homophobic comments but had no specific information.

Electronically Filed 2079 East Ninth Street 190 Floor Cleveland, Ohio 44115

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 11 of 14

> 14. Interviews of
>      Employee-11 – September 28, 2018
>      Employee-12 – October 5, 2018
>      Employee-13 – October 1, 2018
>      Employee-14 – October 5, 2018

When AIG staff asked the above employees if they knew of incidents of Mills making
derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The
above employees stated they had no direct or indirect knowledge of such comments or
behavior.

> 15. Interview of Employee-15 – January 7, 2019.

Employee-15 is a County corrections officer with more than ten years of service. Employee-15
stated that he personally heard Mills say "that faggot is trying to go after us", referring to Marcus
Harris. Employee-15 recalled that this statement was made at some point in time after public
complaints regarding the provision of medical services within the Jail.

# III. Analysis and Findings

## A. As a County Employee Kenneth Mills was Subject to the County Ethics Code

Section 402.01(F) of the County Code states "employee" shall mean any employee of
Cuyahoga County, but not limited to, any person employed, full or part time in a temporary or
permanent capacity, by the County Executive, the Prosecuting Attorney, the County Council, the
Personnel Review Commission, the Board of Revision, the Inspector General, and any other
county agency hereafter established by or pursuant to the charter. As Director of Regional
Corrections, Mills was an employee for purposes of Chapters 402 and 403 of the County Code.
Mills, therefore, are subject to the guidelines established by the County Code and prohibitions
therein.

### B. Section 403.10 of the County Ethics Code Prohibits Discrimination

Pursuant to Section 403.10 of the County Ethics Code, no employee shall discriminate against
anyone on the basis of race, religion, national origin, sex, gender, ethnicity, sexual orientation,
gender identity and expression, disability, or genetic information.

## C. *Cuyahoga County Employees are subject to the County Employee Handbook*

### 1. *Cuyahoga County is Committed to Diversity*

Pursuant to Section 3.01 of the County Employee Handbook,

> The County is committed to fostering a diverse and inclusive workforce, which includes building an environment that respects the individual, promotes innovation and offers opportunities for all employees to develop to their full potential.

### 2. *Cuyahoga County is an Equal Employment Opportunity Employer*

Pursuant to Section 3.02 of the County Employee Handbook,

> The County is committed to providing equal employment opportunities for all individuals regardless of race, color, ancestry, national origin, language, religion, citizenship status, sex, age, marital status, sexual preference or orientation, gender identity/expression, military/veteran status, disability, genetic information, membership in a collective bargaining unit, status with regard to public assistance, or political affiliation.

### 3. *Cuyahoga County Must Investigate Reports of Discrimination*

Pursuant to Section 3.05 of the County Employee Handbook, once potential discrimination is reported,

> The County will investigate all reported concerns. An investigation may include conducting interviews, obtaining written statements, and reviewing records. The County will complete investigations in a prompt manner. The length of the investigation will vary based on the circumstances involved. After obtaining and reviewing all available information, the County will determine if any employee violated any County policy. The employee who made the report and the accused employee(s) will be notified in writing of this determination.

> If the County finds that an employee has violated any County policy then Human Resources, in consultation with the employee's department director or designee, will determine the appropriate action, which may include corrective action, disciplinary action, mediation, training, or transfer.

In the instant matter, the Department of Human Resources requested that the AIG conduct the investigation to avoid any appearance of bias or impropriety.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 13 of 14

### D. There is sufficient evidence to indicate that Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation

Employee-1 stated that during a discussion with Mills about Harris' mileage reimbursement request, Mills said to her "You do know they're lovers? They are faggots." Additionally, Employee-2 stated that Mills made anti-homosexual comments in her presence, noted he thought Harris and Brack were dating, and made it clear he did not like people who are homosexual. Employee-15 stated that personally heard Mills say "that faggot is trying to go after us", referring to Marcus Harris. Based on these three separate statements, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation*. It is unclear, however, whether he took any action based on this discriminatory attitude.

### E. There is sufficient evidence to indicate that Mills was not sufficiently supportive of Cuyahoga County's Continuing Commitment to Diversity

Employee-1 stated that in 2017 during a discussion with Mills about requesting more money for cameras in the jail, Mills told her "You know the Executive is not going to give you any more money, he's a Jew". Employee-1 further stated that in 2017 Mills told her that a sergeant in the Sheriff's department was a terrible employee and insinuated that she only got her job because she is African American. Employee-1 also stated that Mills told her Sheriff Pinkney thought he was untouchable because he is the first African American Sheriff. Likewise, Employee-2 stated that Mills told her Sheriff Pinkney was only appointed because he is African American.

Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women. Allegedly, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist". Moreover, indicating a failure to promote a culture of respect, there was substantial belief among County employees that Mills had made inappropriate comments.

Based on the above statements and information *the AIG is of the opinion that there is sufficient evidence to indicate Mills was not compliant with the County's commitment to diversity*. Specifically, Mills did not appear to be "fostering a diverse and inclusive workforce", or "building an environment that respects the individual". Rather he was inappropriately concerned with the gender, race, and religion of County employees and elected officials.

## IV. Conclusion and Recommendations

The AIG's investigation found an abundance of reports regarding Mills' comments and behavior. However, there were incidents that were relayed to AIG staff by individuals who had first-hand knowledge of Mills' alleged discriminatory comments. Specifically, three County employees separately heard Mills make different discriminatory comments regarding the perceived sexual

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 14 of 14

orientation of a subordinate employee and a contractor. Furthermore, Mills failed to fully comply with the County's commitment to diversity or to promote a culture of respect within the jail. Finally, the reports from the witnesses indicate a need to redouble the County's continuing efforts to support a culture of respect and to allay fears of retaliation for reporting inappropriate conduct.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action as to Mills. The AIG, however, recommends that the County expand its educational efforts to support a culture of respect and protection of whistleblowers.

Valissa Turner Howard
First Assistant Deputy Inspector General

_1.8.19_
Date

Approval as to conclusions and recommendations:

Mark D. Griffin
Inspector General

_1-8-19_
Date

Electronically Filed 07/11/2019 14:38 / COMPLAINT / CV 19 917895 / Confirmation Nbr. 1774895 / CLKSB



# RODERICK LINTON
## BELFANCE LLP
### *Attorneys at Law*

FOUNDED 1885

CHRISTOPHER C. ESKER, Esq.                                    CESKER@RLBLLP.COM

January 24, 2019

Cheryl Forino Wahl, MA, JD
Senior Vice President and Chief Ethics and Compliance Officer
The MetroHealth System
2500 MetroHealth Drive
Cleveland, Ohio 44109

      Re:    Our Client:  Anthony Scarbro d/o/b 01/08/1969
               Our File No. 25598-0001

Dear Ms. Forino Wahl:

    Please be advised that the undersigned represents Mr. Anthony Scarbro for the purposes of investigating a potential malpractice claim against certain medical services providers alleged to be under the direction of the MetroHealth System, and providing services, or having provided services during the subject time, in or through the Cuyahoga County Corrections Center. Pursuant to Ohio Revised Code §2305.11(B), written notice is hereby given to you that Mr. Anthony Scarbro is considering bringing an action against the MetroHealth System and/or its medical service providers relating to those professional services provided to Mr. Anthony Scarbro during the period of October 23, 2016 to April 27, 2016; during which time he was incarcerated pending trial, and through trial, in the Cuyahoga County Corrections Center, which action may be commenced at any time within 180 days after this notice. The potential claim was first discovered by Mr. Scarbro on April 23, 2018, upon receiving information through the Cuyahoga County Prosecutor's Office that it considered certain portions of Mr. Scarbro's negligence and other claims as made against the Cuyahoga County Sheriff, the Cuyahoga County Sheriff's Office, and Jane and John Does, 1-3, whose names were not then known, as potential medical malpractice claims, and is being made expressly to respond to that issue as raised.

    Permit me to suggest that upon receipt of this letter you notify the MetroHealth System risk manager and/or insurance carrier, and have a representative contact the undersigned at their first opportunity.

    I am also enclosing a copy of this notice to you, and I would request that you sign and date same, and return it to the undersigned in the enclosed self-addressed, stamped envelope that I have enclosed for your convenience.

Cordially,

# FILE COPY
Christopher C. Esker
CCE:bms
Enclosure

50 SOUTH MAIN STREET, 10TH FLOOR ▼ AKRON, OHIO 44308

D: 330.315.3374 ▼ R: 330.434.3000 ▼ F: 330.434.9220 ▼ www.rlbllp.com



EXHIBIT
C

C. Forino Wahl, January 24, 2019, Page 2

Re:     Our Client:  Anthony Scarbro d/o/b 01/08/1969
        Our File No. 25598-0001

Via Certified and Regular U. S. Mail

I acknowledge receipt of the above letter and notice received this ____ day of _____,
2019.

                                        _____

**RODERICK LINTON BELFANCE** LLP
*Attorneys at Law*

*Excellence is our tradition.*

50 S. Main Street, 10th Floor
Akron, Ohio 44308-1828



neopost
01/24/2019
**US POSTAGE**

FIRST-CLASS MAIL

$00.47º

ZIP 44308
041L11241418

Cheryl Forino Wahl, MA, JD
Senior Vice President and Chief Ethics and Com
The MetroHealth System
2500 MetroHealth Drive
Cleveland, Ohio 44109

rlbllp.com



**CERTIFIED MAIL**

9171 9690 0935 0217 3716 00



neopost
01/24/2019
**US POSTAGE**

$03.92º

ZIP 44308
041L11241418

Cheryl Forino Wahl, MA, JD
Senior Vice President and Chief Ethics and Compliance
The MetroHealth System
2500 MetroHealth Drive
Cleveland, Ohio 44109

rlbllp.com